THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY WALKER, Defendant-Appellant.

First District (5th Division) No. 1—89—0583

Opinion filed May 22, 1992.

Michael J. Pelletier and Leslie Wallin, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Judith Hannah, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

A jury found defendant Larry Walker guilty of armed robbery and theft, but not guilty of murder. The court entered judgment on only the armed robbery conviction and sentenced defendant to 18 years' imprisonment. On appeal, defendant contends he was not proved guilty beyond a reasonable doubt; improper closing argument deprived him of a fair trial; and the sentence is excessive.

On November 10, 1987, at about 11:30 p.m., 51-year-old Leroy Davis was beaten to death outside of a liquor store in Chicago.

At trial, Harvey Webb testified for the State that he had known defendant (by his nickname Pennyman) for one year, and had known Ernest Stevenson (by his nickname Kirk Dog) for 19 years. Stevenson was a friend of his. On November 10, 1987, at 11 p.m., Webb went to a liquor store in Chicago, where he saw Stevenson, defendant and Alvin Carlos standing outside the store, talking and drinking. Defendant wore a brown coat. The four men stood talking for awhile, sharing bottles of wine. A "couple more guys" were there, also, and were standing two feet away from them but not conversing with them.

After about a half-hour, Webb, who stood three or four feet away, heard Stevenson and defendant talking about the victim, who had just arrived and parked his car in front of the store.

Webb overheard Stevenson "saying he wanted to break the windshield and drag the man out of the car." On November 16, 1987, Webb testified before a grand jury that Stevenson "was talking about going to get something to break the windshield of the car." He did not mention pulling the man out of the car.

Defendant told Stevenson "to wait, the man was getting out [of] the car." Webb had testified before the grand jury that defendant "was saying, hold on for a minute."

Webb then walked into the store. The victim also went into the store, where he bought a pint of whiskey and a can of Coke.

When the victim exited the store and walked to his car, Webb saw "Pennyman [defendant] come from behind the thing and hit the man with the board." The victim fell onto the hood of his car. Defendant "continued striking him" in the head. He hit the victim "six or seven times." The victim "rolled over on the ground and Ernest Stevenson had started to go in his pockets." Defendant "pushed [Stevenson] off the man, and took the man around the corner, drug [sic] him around the side of the building." Stevenson followed. Stevenson then returned, "picked up some change and bottle and keys and he threw some stuff in the garbage." Webb "thought it was some money lying there." Stevenson then took the keys and got in the man's car and

fled. Webb did not see defendant again that night. Webb had also thrown some bottles in the garbage outside the liquor store that night and on other nights.

On cross-examination, Webb denied seeing Stevenson strike the victim with the board. The first time he spoke with the police, several days after the murder, the police asked if he had been present at the liquor store on November 10, 1987, and then asked only where Stevenson could be located. They never asked what occurred on the night in question. The police were only "concern[ed] about finding Kirk Dog [Stevenson]" and did not "ask[ ] me who killed the man or nothing."

Webb testified that in 1978 he had pled guilty to robbery and was paroled after serving one year in prison, and was convicted of misdemeanor theft, for which he received six months' conditional discharge.

Thomas Brankin, a Chicago police officer, testified that on November 11, 1987, at 1 a.m., he responded to a call indicating that a body had been found outside of a liquor store. At the scene, he observed that in the parking lot area in front of the store, there were bloodstains on the ground. There was a smear of blood three feet from the larger blood smear in the parking lot area, toward the vacant lot area. In the vacant lot area at the rear of the parking lot was the victim's body. He wore two pair of pants, both of which were open. The back of the victim's clothing was extremely dirty and bore blood marks, consistent with having been dragged from the parking lot to the vacant lot where the body was found. There was a "length of board" found four or five feet from the body. The board appeared to have bloodstains and hair on it. A Gallo wine bottle was also found inside a brown bag which had blood on it.

The parties stipulated that if Cathy Gahangahn were called to testify, she would state that she was a police officer in the crime laboratory. She examined the board found at the scene of the murder. It measured 30 inches by 5 inches by 1¼ inches. Hair was recovered from the board.

Maria Pulling, a Chicago police officer in the crime laboratory, testified for the State that she examined the hair recovered from the board. In her opinion, it was the same as the head hair taken from the victim's body.

Dr. Michael Chambliss, a forensic pathologist, testified for the State that he examined the victim's body. The cause of death was injury to the skull and brain. He had numerous lacerations and abrasions in the head area, on his right eye, forehead, nose and cheeks.

There were two abrasions on the back of his head. The head injuries appeared to have been caused by a blunt instrument.

The back of the skull revealed a fracture which extended to the spinal cord, from behind one ear to the spine. There was also a second fracture to the right occipital bone. It would take a significant amount of blunt force to cause such a fracture due to the thickness of an adult's skull. Multiple abrasions on his back were consistent with having been dragged. An autopsy revealed multiple injuries to the brain, again consistent with blunt trauma. The blunt traumas could be produced by the 30-inch board found near the body. Blood tests revealed that the victim had a blood-alcohol level of 77 milligrams.

Rayford Ricks, an evidence technician for the police department, testified for the State that he investigated the scene of the murder at 2:10 a.m. He recovered the 30-inch piece of wood. At the front of the store was a parking lot where there was a large pool of blood on the ground. Inside a garbage can near the pool of blood were two bags with blood on them, and with a pop can and a wine bottle in the bags.

Jim Sanders, an evidence technician, testified for the State that he examined a car parked in the rear of the liquor store at about 11 a.m. on November 11, 1987. There were bloodstains on the hood. Fingerprints were taken from the hood. Palm prints were taken from Ernest Stevenson and Harvey Webb.

Christine Braun, a forensic serologist with the police department, testified that she examined blood from the street at the scene; blood from the top of a car; and blood from the victim's body. All three samples were type O blood. She also examined the 30-inch board and found human blood on it, but was unable to test for blood type. Traces of blood were found on the left shoulder of a jacket, too. There was blood present on the "side bottoms" of a pair of shoes.

William Foley, a Chicago police officer, testified that he investigated the murder. On November 11, 1987, at 1 p.m., defendant told him that on the previous night he had seen a man, whom he did not know, beating the victim with a board. The man went through the victim's pockets; dragged the victim's body around the building, out of defendant's sight; and returned to drive away in the victim's car.

Michael Kill, a Chicago police officer, testified for the State that on November 12, 1987, at 3 p.m., he spoke with defendant about the murder. Officer Kill testified to the details of a statement which defendant gave him. Those details were consistent with the statement defendant gave Officer Foley the previous day.

Two days later, on November 14 at 9 p.m., Officer Kill went to the scene of the crime and spoke with several people gathered there,

including Harvey Webb, who later stated that someone nicknamed "Kirk Dog [Stevenson]" was involved. Webb later told them that Kirk Dog's last name was Stevenson and was a friend of Webb's brother. Kill then went to defendant's home and brought defendant to the police station at 11 p.m. on November 14. At 4 a.m. on November 15, Stevenson was brought to the station. The police later took defendant's jacket and a pair of shoes.

Craig Cegielski, a Chicago police officer, testified that on November 15, 1987, at 7 a.m. he interviewed defendant.

"[Defendant] related to me that on *** the night of the incident, *** he was in the parking lot of the Sangamon Liquors ***. He stated, he was there drinking. He was with his friend, whom he called Kirk Dog, whose real name was Ernest Stevenson. He stated he was there with another person by the name of Harvey Webb. And then he told me that there [were] two other people that were standing around drinking. At one point in time, the victim, Mr. Davis pulled up to the parking lot in his auto. At this time, Mr. Walker told me, he had a conversation with his friend, Mr. Stevenson, and Mr. Stevenson said that they should get a board, break the window of Mr. Davis' car and pull him out and rob Mr. Davis."

Cegielski explained that, although it was not in his report, he recalled defendant telling him that "Stevenson said *** something *** like, this is our payday, sir." Cegielski testified further:

"As the conversation was being had between the two, Mr. Davis got out of his vehicle and he went into the Sangamon Liquor Store and came out a few moments later. He evidently made a purchase, because he was carrying a bag in one hand and some money in another hand. Mr. Walker told me it was at that time that Mr. Stevenson hit the victim over the head, over the top of the head with this length of board. He described the board to be approximately three feet long, I think, it was. He stated that when his friend, Mr. Stevenson, struck the victim over the top of the head, that the victim fell to the ground. When the victim fell to the ground, he dropped what he was carrying, which happened to be a package and a $10 bill.
* * *
Mr. Walker told me that he bent down and picked up the $10 bill.
* * *
*** He picked up the $10 bill off the ground."

Mr. Walker told me that his friend, Mr. Stevenson, hit the—hit the victim again and went through—went through the victim's pockets. As his friend, Mr. Stevenson, went through the victim's pockets, he took $12 *** out of the victim's pockets and handed it to Mr. Walker. Mr. Walker then told me that his friend, Mr. Stevenson, grabbed the victim by the ankles and dragged him from the door—from approximately the front of door to the side of the Sangamon Liquors building, which happens to be a vacant prairie. Mr. Walker then told me that his friend, Mr. Stevenson, returned to the front of the building, jumped into the victim's car and drove off in the car.

* * *

Mr. Walker told me that later in the evening, he went over by his friend's house, Mr. Stevenson. And at that time, he had $22 in his possession that they took from the victim. And Mr. Walker told me that he gave it back to his friend, Mr. Stevenson.

* * *

I asked him, why did you give the money back to him, and he said, well, he earned it. Then he says, they brought [sic] something to drink. I don't recall what it was. And that they drank some things."

During the beating defendant was standing "right there."

Cegielski testified further that he took defendant's coat and shoes. At one point, defendant was shown a photo array. He identified Webb and Stevenson as being at the scene during the crime.

Thomas Rieck, an assistant State's Attorney, testified for the State that on November 15, 1987, he took a statement from defendant at 11 a.m. Defendant first indicated he knew nothing about the murder. He then indicated that he was present at the time.

"I was out in front of the liquor store. I was with a person he called Kirk Dog and a second person he called Harvey. He indicated that while he was out there there was an older black man who had parked his car towards the rear of the side of the building of the liquor store. The man had gone inside the liquor store and he indicated, he told me that he came out of the liquor store and was headed back towards his car. Larry then said that as the man was walking back towards his car he got towards his car, the front end as it pulled in and Kirk Dog had picked up a board, followed the man and hit the man in the head with the board. He then stated that Kirk Dog had, the man fell to the ground and Kirk Dog searched through the

man's pockets and after having searched through his pockets Kirk Dog got into the older black man's car and drove away."

Defendant then changed his story a third time.

"Well, the next time he told me, he began repeating the first or second version of what he had said. He said yes, I was out there, I was with Harvey, I was with Kirk Dog. When we [were] out in front of the liquor store *** as we were out there the older black man had driven in, parked his car, gone into the liquor store and the older black man again had come out, was going back towards his car that had been parked back towards the rear. He then said that Kirk Dog did pick up a board, hit the man with the board and as the man fell to the ground $10 fell to the ground [defendant] picked up the $10 that was on the ground and Kirk Dog searched through the man's pockets. After having searched through the pockets Kirk Dog gave Larry $12 besides the ten that Larry had already gotten. Then Kirk Dog got into the black man's car, again drove off. [Defendant] walked away."

Later that night, defendant met up with Stevenson, and defendant gave the $22 to Stevenson.

Defendant admitted that he lied in his first and second versions. Rieck put the statement in writing. Defendant reviewed the handwritten statement, agreed that is what he said, but refused to sign it.

Burt Robinson testified for the defense that he had been friends with defendant for 13 years and lived about one block from defendant. On November 10, 1987, at 11:30 p.m., he was outside of the liquor store with Walter Tony, Harvey Webb, defendant, and Ray. They had been drinking wine, with the bottles in brown paper bags, for about 1½ hours when Kirk Dog (Stevenson) arrived. Defendant was in the store. "In the store, I think. He went in to get a drink." He was not certain, but "[t]hat is what I believe. There wasn't no place else for him to be unless he was behind me and the only time you go behind is to take a leak." Stevenson "kept looking in the store like this (indicating) bending down." Stevenson stood "[r]ight at the door." Robinson stated further that Stevenson "kept bending down." Robinson stood "right beside him because I was wondering what he was looking at." Stevenson went to the side of the building and returned with a long board.

The victim exited the store and Stevenson hit him with a board. The victim "fell on his face on the car, on the hood of the car and [Stevenson] just kept hitting him. He hit him. When he hit him about the fourth time I ran up and said, 'Oh, my man, don't hit the man no

more,' like that." Stevenson said, "You want some of this?" Robinson "said no and I backed off, backed away." As he backed away, defendant was "coming out the door." Robinson testified further:

"[Defendant] was standing on the side of the door, standing up and then he went up to him and said, 'Don't F with him,' or you know, something like that, something like that. He said don't mess him no more, leave him alone. The dude was going crazy. He started going crazy."

Defendant "told [Stevenson] to stop." Stevenson hit the victim a few more times. The victim then slid down the car to the ground. Either Stevenson or Webb, or both of them, grabbed the victim and dragged him to a vacant lot next to the building. Stevenson drove the man's car away. Robinson did not see anybody go through the victim's pockets. He did not see defendant pick up any money. He did not see Stevenson hand any money to defendant. "No, because he got in the car and left." Defendant and the other men left.

Defendant testified that on November 10, 1987, he was 33 years old. At about 11:30 p.m. that night, he was outside a liquor store with Burt Robinson, Walter Tony and Ray Collins. He had been there for 20 to 30 minutes, talking and drinking. He saw Harvey Webb and Stevenson there, also. At one point, defendant went inside the store for 5 or 10 minutes. When he exited the store, he saw Stevenson hitting the victim with a stick. He recognized Stevenson as a friend of Webb. Robinson was trying to get Stevenson to stop. "Then I walked up and I tried to get him to stop and he hauled back and told me to mind my own business or he was going to let me have it." Defendant tried to get the man to stop and might have grabbed Stevenson. "I am not sure what I did that night because I was drinking, you know." Stevenson was about 5 feet 9 inches tall and weighed 175 pounds. Defendant was 5 feet 10 inches tall and weighed 245 pounds.

Defendant backed away two or three feet. Stevenson dragged the victim to the side of the building and went through the victim's pockets. Defendant denied reaching down to pick up any money. He also denied that Stevenson ever handed him any money. He did not know what Stevenson did with the victim's Coke can and whiskey bottle.

Defendant testified further that Stevenson then went through the victim's pockets, took some keys and drove away in the man's car. Defendant then started "walking, I was turning to walk towards home, you know, Sangamon and I noticed $10 were on the ground and I picked it up." The money was where the man was first hit. Defendant did not know whose money it was. "It could have been anybody's." He put the money in his pocket and went home. He did

not later give the $10 to Stevenson. He never told that to the police or the prosecutor. He did not see Stevenson later that night and did not remember telling the police or the prosecutor otherwise.

Two days later, on November 12, defendant spoke with the police, but did not tell them Stevenson's name because he was afraid. On November 13, defendant again spoke with the police, but did not report the assailant's name. He was afraid to identify the killer. On November 14, defendant was taken to the police station. He spoke with an assistant State's Attorney. He refused to sign the statement "[b]ecause when I looked at the statement I saw accusations in the statement that I didn't say."

Defendant initially did not tell the police Stevenson's name. He also did not tell the police that he tried to stop the beating. "No, because I didn't want to cooperate at all at that time."

On the night of the murder, defendant was wearing the shoes admitted into evidence, and he might have stepped in blood. Although the jacket introduced into evidence was defendant's, he was not wearing it on the night of the murder and he did not know how blood got on the jacket. He never touched the victim's body.

The jury returned a verdict of not guilty of murder and guilty of theft and armed robbery.

OPINION

Defendant first contends that he was not proved guilty of armed robbery beyond a reasonable doubt.

When the sufficiency of evidence is challenged on appeal, the question this court must answer is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

It is within the province of the jury to determine the credibility of witnesses and the weight to be given their testimony. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) This court may not substitute its judgment for that of the trier of fact regarding the weight of the evidence and the credibility of the witnesses unless the testimony is so improbable as to raise a reasonable doubt of guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

Armed robbery is the taking of property "from the person or presence of another by the use of force or by threatening the imminent use of force" while "armed with a dangerous weapon." Ill. Rev. Stat. 1989, ch. 38, pars. 18—1, 18—2.

A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) Mere presence at the scene of a crime does not render an accused accountable for the offense. (*People v. Johnson* (1991), 220 Ill. App. 3d 550, 581 N.E.2d 118.) However, active participation is not a requirement for imposing liability under a theory of accountability. *People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174.

Factors which may be considered by the jury, and which may raise an inference that an accused aided in the commission of a crime, include: (1) defendant's presence during the planning of the crime; (2) defendant's presence at the scene of the crime without any negative reactions to it; (3) acceptance of illegal proceeds from the actual perpetrator; (4) flight from the scene, especially after the victim has been injured or killed; (5) failure to report the incident; and (6) defendant's continued association with the perpetrator after the criminal act. *People v. Johnson*, 220 Ill. App. 3d 550, 581 N.E.2d 118 (and cases cited therein).

In regard to the first factor, defendant's presence during the planning of the crime, Webb testified that he overheard Stevenson telling defendant that "he wanted to break the windshield and drag the man out of the car." Webb then heard defendant reply, telling Stevenson "to wait, the man was getting out [of] the car." (Webb told the grand jury that defendant had replied, "Hold on for a minute.")

Webb's testimony was corroborated by Officer Cegielski, who testified that five days after the murder, defendant told him that on the night of the murder defendant "had a conversation with his friend, Mr. Stevenson, and Mr. Stevenson said that they should get a board, break the window of Mr. Davis' car and pull him out and rob Mr. Davis." In addition, defendant stated that prior to the robbery "Stevenson said *** something *** like, this is our payday."

Consequently, although there was no testimony indicating that defendant and Stevenson expressly agreed to attack the victim, words of agreement are not necessary to show a common purpose to commit a crime. (*People v. Reid*, 136 Ill. 2d at 62.) The jury could consider this evidence along with other evidence in deciding whether the evidence raised an inference that defendant had knowledge that a crime was going to occur. See *People v. Thicksten* (1958), 14 Ill. 2d 132, 150 N.E.2d 813 (affirming conviction for robbery, notwithstanding fact that defendant did not take an active part in the crime; jury could

consider, *inter alia*, that defendant knew that a robbery was to be committed); *People v. Scherzer* (1989), 179 Ill. App. 3d 624, 640-41, 534 N.E.2d 1043 (defendant was accountable for the crimes because there was circumstantial evidence indicating, *inter alia*, defendant knew of the plot to kill the victim prior to the crime occurring); *People v. Johnson* (1965), 61 Ill. App. 2d 319, 324, 210 N.E.2d 344 ("[Defendant] was present when the plan to rob [the victim] was formulated").

Defendant also argues that "Webb's trial testimony—that defendant beat the victim with the board—was *disbelieved* by the jury, or else it would have found defendant guilty of murder." In effect, defendant is arguing that if the jury disbelieved Webb's testimony that *defendant* beat the victim with the board, the jury must also disbelieve Webb's testimony that defendant and Stevenson discussed or planned the crime prior to attacking the victim. The jury, however, could believe only portions of Webb's testimony, particularly where those portions were corroborated by other witnesses.

In regard to the second factor relating to accountability, failure to oppose the crime, there was evidence of defendant's being present at the scene of the crime without showing any negative reaction to it. "If the [evidence] shows that [the] person was present at the *** crime without disapproving or opposing it, *** the trier of fact [may infer that he] assented to the commission of the crime and *** thereby aid[ed] and abett[ed it]." (*People v. Reid*, 136 Ill. 2d at 62.) The court in *People v. Johnson* explained:

> "[A]n innocent spectator is not criminally responsible because he happens to see another person commit a crime, but if the proof shows that a person is present at the commission of a crime without disapproving or opposing it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the same. In the absence of explanation, such conduct is not consistent with that of an innocent person similarly situated, and is sufficient to support an inference that a common understanding or design existed." *People v. Johnson*, 61 Ill. App. 2d at 323, quoting *People v. Kolep* (1963), 29 Ill. 2d 116, 120, 193 N.E.2d 753.

Officer Cegielski testified that defendant told him he stood "right there," while Stevenson inflicted the brutal and fatal blows on the victim. Defendant said nothing, and did nothing to intervene, according to the State's witnesses. The jury here could consider this evidence in

finding that defendant was not an innocent spectator. See, *e.g., People v. Scherzer*, 179 Ill. App. 3d at 640-41 (defendant was accountable for the crimes because, among other things, while a codefendant beat the victim, the "defendant did not tell him to stop, try to prevent him from striking her, or render her aid in any manner"); *People v. Johnson*, 220 Ill. App. 3d at 555 (holding that proof of defendant's guilt of robbery under an accountability theory included the fact that he stood next to another man who demanded the victim's necklace and pulled it from the victim's neck while defendant "did not say or do anything to intervene or otherwise express his disapproval or opposition" to those actions).

In regard to the third factor tending to show accountability, a defendant's accepting proceeds from a second perpetrator during or after the crime may raise an inference of participation. In finding sufficient evidence of accountability, the court in *Johnson* pointed to the evidence that "at some point during their flight from the scene, [the second man] gave defendant the gold chain taken in the robbery." *People v. Johnson*, 220 Ill. App. 3d at 555. See also *People v. Scherzer*, 179 Ill. App. 3d at 640-41 (defendant accountable for crime where evidence showed he accepted part of proceeds); *People v. Johnson*, 61 Ill. App. 2d at 324 ("Whether he went to the man to help search him or to find out if he was hurt was for the jury to determine").

In the present case, defendant reported to Officer Cegielski that "[w]hen the victim fell to the ground, he dropped what he was carrying, which happened to be a package and a $10 bill." Defendant "bent down and picked up the $10 bill." Stevenson then "hit the victim again and *** went through the victim's pockets." Stevenson took $12 "out of the victim's pockets and handed it to [defendant]." This testimony shows defendant taking the victim's money, and thus sharing the proceeds, while the victim was actually being beaten and searched by Stevenson.

The jury might also have found it significant that there was nothing in the evidence suggesting that—except for defendant—any other person standing in front of the liquor store picked up money from the ground or accepted the additional $12 from Stevenson as he searched the victim.

Defendant testified, however, that it was not until after Stevenson drove away that defendant started walking home when he "noticed $10 were on the ground and [he] picked it up." The money was where the victim had first been hit. We find that even if the jury believed that defendant picked up the $10 *after* Stevenson dragged the victim

to the back of the building, it would not preclude the jury from finding defendant guilty of armed robbery.

Our supreme court recently explained that, in order to constitute an armed robbery, the property does not need to be taken directly from the person or within his presence.

> " 'The requirement that there be a taking "from the person or presence" is not, however, limited to removal of the property from the victim's person or from the immediate presence of the owner, possessor or custodian.' " (*People v. Blake* (1991), 144 Ill. 2d 314, 319, 579 N.E.2d 861, quoting *People v. Smith* (1980), 78 Ill. 2d 298, 302, 399 N.E.2d 1289.)

The offense of armed robbery is complete when defendant or the individual for whom he is accountable "used force or the threat of force to cause the victims to part with possession or custody of the property against their will." *People v. Blake*, 144 Ill. 2d at 322.

In *People v. Clemons* (1989), 179 Ill. App. 3d 667, 534 N.E.2d 676, defendant was convicted of armed robbery for taking a dollar from the victim, his father. The jury acquitted him of one count of murder during the course of armed robbery. The court found that although "defendant's statement does not make clear whether he took the dollar immediately after the first attack or whether he took it after returning to the house from the bar, a point at which his father was already dead, either case supports the jury's verdict." (*People v. Clemons*, 179 Ill. App. 3d at 672-73.) The court rejected defendant's argument that the purpose of using force against the victim was for murder, not for robbing him of the $1; instead finding that he used the force "not only as a means to kill, but also as a means to take property." (*People v. Clemons*, 179 Ill. App. 3d at 672-73.) The court concluded: "[E]ven if defendant did not take the dollar until after he returned from the bar, the necessary concurrence between the use of force and the taking would still exist since the taking of the dollar resulted from the use of force from the first attack." *People v. Clemons*, 179 Ill. App. 3d at 673; see also *People v. Williams* (1987), 118 Ill. 2d 407, 416, 515 N.E.2d 1230 ("Whether the defendant took the necklace from the victim's person or whether he picked it up off the floor after committing the assault, we believe that in this case there was the necessary concurrence between the defendant's use or threat of force and his taking of the necklace to give rise to the offense of armed robbery under the statute"); *People v. Scherzer*, 179 Ill. App. 3d at 639 (court upheld a conviction for armed robbery, attempted murder and armed violence, despite defendant's argument that he believed the victim was dead when he removed the rings from her hand).

Thus, defendant's picking up the $10 from the exact location where the victim had fallen seconds or minutes after Stevenson used force to cause the victim to part with his possessions, *i.e.*, the money in his hand, the money in his pocket, the keys to his car and his car, would support a conviction under a theory of accountability.

In contrast, in *People v. Tiller* (1982), 94 Ill. 2d 303, 316, 447 N.E.2d 174, the court reversed a conviction for armed robbery on an accountability theory. In *Tiller*, the defendant had left the scene before the murder was committed by a codefendant and returned after the murder to take the victim's vehicle. The court held that the force used to commit the murder could not sustain a conviction for armed robbery because "there [was] no evidence to show that the force exerted against [the victim] was for the purpose of depriving her of the [vehicle]." (*People v. Tiller*, 94 Ill. 2d at 316.) "Taking advantage of an existing threat, where that threat was not delivered to persuade the victim to release control of property, creates no additional danger of great bodily harm." *People v. Tiller*, 94 Ill. 2d at 316.

In contrast to *Tiller*, in the present case defendant did not leave the area of the liquor store before the murder. In fact, he remained at the scene throughout the brutal beating, watching as Stevenson used the "significant amount of blunt force" necessary to fracture the skull. Even considering only defendant's testimony, when Stevenson dragged the body away, defendant walked over and picked up the $10 which the victim had dropped when the first blow was struck. The jury could find that defendant was not merely taking advantage of an existing threat, and that the existing threat was directly related to the joint goal of depriving the victim of his property.

In regard to the fourth factor which the jury could consider, no flight from the scene, the evidence indicated that defendant remained at the scene while Stevenson planned the beating; while Stevenson methodically beat the victim, searched him, moved his body, and drove away in his car; and finally left the victim, not knowing whether he was injured or dead. Defendant simply left the victim, who was clearly seriously injured or dead, lying in an empty lot. See *People v. Thicksten*, 14 Ill. 2d 132, 150 N.E.2d 813 (affirming conviction for robbery, notwithstanding fact that defendant did not take an active part in the crime; defendant left victim unconscious in a ditch and made no effort to call the authorities); *People v. Johnson*, 61 Ill. App. 2d at 324 (defendant "did not flee the scene before the act was done, he left the man in an obviously injured condition on the ground where he fell").

Moreover, the jury could consider defendant's failure to report the crime. After the November 10 murder, defendant made no effort to call the authorities. Even when the police interviewed defendant on November 11, on November 12, and again on November 14, defendant did not identify Stevenson as the assailant. He did not identify Stevenson until November 15 at 7 a.m., when he admitted lying in his earlier statements. At 11 a.m. that day, however, defendant once again reverted to his position that he knew nothing about the murder. See *People v. Johnson*, 61 Ill. App. 2d at 324 (defendant made no effort to contact authorities).

Furthermore, the jury could consider defendant's continued association with Stevenson after the crime. According to statements made by defendant to the police and the assistant State's Attorney, after leaving the scene of the murder, defendant later went to see Stevenson and gave him the $10 he had picked up from the ground and the $12 which Stevenson had handed to him. Defendant told Cegielski he turned the proceeds over to Stevenson, because he had "earned it." Defendant and Stevenson then went out and bought something to drink with the money.

The jury could find this continued association with Stevenson and their use of the proceeds were relevant to defendant's accountability for the armed robbery.

In summary, the evidence showed that before the murder defendant knew a crime was to occur; during the beating he watched and took the victim's money from Stevenson and from the ground; and after the murder, defendant fled from the scene, failed to report the incident, associated with Stevenson later that night, and spent the proceeds with Stevenson.

The jury could consider all of this evidence in determining, based on these factors related to accountability, that defendant aided Stevenson in the commission of the armed robbery.

 The jury could also consider the credibility of the witnesses and the physical evidence. We note generally that defendant's credibility was undermined by his having offered numerous versions of the incident during the police investigation. The jury was entitled to disbelieve defendant's testimony denying that he told the police any other version of his own conduct during the incident, or believe that he initially refused to identify Stevenson as the killer because he was afraid.

Initially, on November 11, 1987, at 1 p.m., defendant told Officer Foley that he saw an unknown assailant beating the victim. On November 12, at 3 p.m., he gave a similar statement to Officer Kill.

On November 15, at 7 a.m., however, defendant told Officer Cegielski that it was Stevenson who told defendant he was going to "get a board, break the window of Mr. Davis' car and pull him out and rob Mr. Davis."

Later on November 15, additional versions of the incident were given by defendant to Assistant State's Attorney Rieck. Defendant first told Rieck on November 15 at 11 a.m. that he knew nothing about the murder. Second, he stated to Rieck that he was present and saw Stevenson beat and rob the man. Third, defendant told Rieck the same version that he told Officer Cegielski, *i.e.*, that defendant picked up the $10 as the victim fell to the ground; Stevenson gave defendant an additional $12; and defendant returned the $22 to Stevenson later that night.

Defendant points out that "a confession is only one item of evidence" which, "standing alone, in light of other conflicting evidence, may not be enough to sustain a conviction." (*People v. Mullen* (1990), 141 Ill. 2d 394, 403, 566 N.E.2d 222.) The only "conflicting evidence" defendant offered, however, was the testimony of Robinson. His version of the events contradicted all other versions given by defendant to the police and the assistant State's Attorney.

The jury could reasonably have believed the police officers and assistant State's Attorney who testified as to statements defendant had made to them during the investigation. The jury was not required to accept defendant's testimony at trial, particularly where it was one of many versions he had provided.

In addition, the physical evidence tended to indicate defendant's involvement. Webb testified defendant was wearing the same brown coat which the police later took from defendant, examined, and discovered blood on the coat. Blood was also found on defendant's shoes. The jury apparently did not accept defendant's explanation that the blood was on his shoes only because he might have stepped in blood or that he was not wearing the brown jacket on the night of the murder.

We must conclude, after viewing the evidence in the light most favorable to the prosecution, that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence showed that defendant, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission," aided or agreed or attempted to aid Stevenson in the planning or commission of the offense of armed robbery. Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).

We conclude that there was adequate evidence from which the jury could have determined that defendant was aiding and abetting Stevenson in the commission of the robbery. "His conduct was not consistent with that of an innocent person and the jury's verdict is not contrary to the weight of the evidence necessary to sustain a criminal conviction." *People v. Johnson*, 61 Ill. App. 2d at 324.

Before we go on to discuss various other errors which defendant alleges, we note that many of those errors were not objected to at trial and thus are waived for purposes of review. Defendant concedes that he did not object, but asks that we consider the issues under the plain error rule (134 Ill. 2d R. 615(a)) since the evidence was closely balanced and he was deprived of a fundamental right. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) In view of our discussion above demonstrating the strength of the State's case against defendant, we cannot say that the evidence here was closely balanced. However, even if it were closely balanced, we would not find the alleged errors mandate reversal for the reason explained below.

Defendant next contends that he was denied the right to a fair trial because the prosecutor, in his closing argument, misstated the law of accountability. The State argued:

> "If he shares in the proceeds of the armed robbery, if he has that money in his hand, he accepts that money, he takes that money, he [*sic*] means he is guilty of the armed robbery.
>
> * * *
>
> *** [E]ven if you were to believe that Kurt [*sic*] Dog struck the blow and the defendant only took some of the money, he is just as guilty of murder, he is just as guilty of armed robbery. That is the law of accountability in Illinois, that is the law in this case.
>
> * * *
>
> If the defendant had any money, he's guilty of murder. If he participated in the robbery, his [*sic*] guilty of murder."

These comments were made just after the prosecutor quoted to the jury the precise language from the statute defining accountability (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c)):

> "[Y]ou will be instructed as follows. A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense."

■ In *People v. Johnson* (220 Ill. App. 3d 550, 581 N.E.2d 118), the court found no error where the prosecutor argued in closing that a person was accountable for the crime if he accepted any of the proceeds after its commission. The court held:

> "Although mere acceptance of the proceeds of a crime does not, standing alone, render a person accountable for the crime, knowing acceptance of stolen property is one of several factors which, as noted above, may be considered by the trier of fact as circumstantial evidence in determining whether defendant is guilty under the law of accountability. [Citation.] We do not view the prosecutor's argument as improper. Moreover, we note that both the prosecutor and defense counsel quoted the statutory definition of accountability, which refers to the defendant's conduct 'before or during the commission of an offense,' and the definition was repeated in the court's formal instructions, which the jurors were advised they were obligated to follow. Consequently, any misstatements of law and potential prejudice therefrom were adequately cured by the arguments and the jury instruction correctly defining the law of accountability. [Citation.]" (*People v. Johnson*, 220 Ill. App. 3d at 563.)

We follow that reasoning here. While the prosecutor's comments which defendant quotes only address *one* of the various factors which may be considered in determining whether an accountability theory applies, the prosecutor properly pointed to other factors, also. In addition, in his argument to the jury he quoted the accountability statute.

Moreover, the trial judge instructed the jury appropriately when necessary, for example:

> "PROSECUTOR: If the defendant participated in the armed robbery, the law is he's guilty of murder in this case. That's what this instruction says. That is the law. If the defendant had any money, he's guilty of murder. If he participated in the robbery, he's guilty of murder. That is the law of felony murder. Next I believe his Honor will instruct you—
>
> THE COURT: That is objectionable, that last comment that you made concerning if he had any money. I'm going to instruct the jury as to what the law is, ladies and gentlemen, on this point. That is incorrect *** and your objection to that [defense counsel], is sustained."

The court also told the jury several times during arguments, and formally instructed the jury following the arguments, that the closing arguments are not evidence "and any statement or argument made by the attorneys which is not based on the evidence should be disre-

garded." The court gave the jury the proper instruction defining accountability, also.

We also note that defense counsel told the jury that the prosecutor had correctly cited the law of accountability to them:

"DEFENSE COUNSEL: [B]ut you will note, perhaps you even noted it when counsel, [the prosecutor] was reading to you the law in this area, that there are essentially three elements you have to look at ***."

Thus, we find the argument was not improper. Furthermore, any possible impropriety was cured by the court's instructions.

See also *People v. Willis* (1983), 119 Ill. App. 3d 34, 456 N.E.2d 165 (holding that the prosecutor did not misstate the law of accountability in his closing argument by implying that defendant's presence at the scene of the crime was enough to support an armed violence conviction; moreover, the jury was properly instructed on the law of accountability and was admonished by the court not to accept counsel's version of the law); *People v. Green* (1973), 14 Ill. App. 3d 972, 987, 304 N.E.2d 32 (holding that it was not a misstatement of the law of accountability for the prosecutor to argue that "even if the jury were to believe defendant's written statements, defendant would be guilty by his mere presence and his failure to report the others to the police"; this was one of various factors which determined accountability).

■ In a related argument, defendant contends that the State misstated the facts when it argued:

"[Defendant] testified that he shared in the proceeds of the armed robbery, which makes him accountable for the armed robbery and the felony murder. If you believe his statements, he is guilty."

Defendant actually testified only that after Stevenson beat the victim and dragged him away from the front of the liquor store, defendant started "walking, I was turning to walk towards home, you know, Sangamon and I noticed $10 were on the ground and I picked it up." While defendant testified that the money "could have been anybody's," he also testified that it was found at the precise spot where the victim had fallen after being beaten to death. The argument was not improper.

Defendant next argues that the prosecutor misstated the law and improperly bolstered the credibility of its witnesses. The prosecutor argued:

"If you believe the defendant's testimony on the stand, if you can put it all out of your mind, all the contradictory statements

that he's made in the past, all the versions of this story that he's told, if you can put that behind you, then you can even look to hear what he said, you would have to believe that the state's attorney is lying, that the police are lying, almost all the other state witnesses are lying in order to believe this defendant, in order to give any credence to what he said when he was on the stand, it has to be a conspiracy. There's no other way around it, and I ask you ladies and gentlemen, why would there be a conspiracy? There's no conspiracy."

Defendant points out that even if Brankin, Pulling, Chambliss, Ricks, Sanders, Foley and Kill all told the truth, the jury could still believe defendant's testimony that it was Stevenson who beat the victim and dragged him to the empty lot. "Thus, the jury clearly would not have to find that these witnesses were lying in order to acquit defendant." Defendant argues further that even if Braun did find blood on defendant's jacket, she could not tell if it was human or if it was the victim's blood. Moreover, the blood on his shoes could have been from walking around at the scene.

Moreover, defendant argues that the State improperly bolstered the credibility of Webb, Cegielski and Rieck by arguing that the jury "had to weigh defendant's credibility against not only that of Webb, Cegielski and Rieck, but also against the other State witnesses."

■ It is true that with regard to certain kinds of testimonial evidence a jury may believe in the sincerity of the State's witnesses, yet still acquit defendant. This is particularly true in cases involving identification testimony. For example, in some cases a "contradiction could possibly be due to a witness' mistake, as opposed to when the contradiction was almost certainly due to a witness lying." *People v. Smith*, 78 Ill. 2d 298, 399 N.E.2d 1209 (and cases cited therein); see also *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931 (error for prosecutor to argue acquittal is equivalent to finding State's witnesses had lied; identification was a contested issue); *People v. Ridley* (1990), 199 Ill. App. 3d 487, 557 N.E.2d 378 (improper to tell jury that in order to believe defense witnesses, it had to find the State witnesses were lying; identification is contested issue).

Here, identification was not an issue. In the portion of the closing argument which defendant complains of, the prosecutor was comparing statements made by defendant to an assistant State's Attorney and the three police officers. In this context, it is quite plausible to contend that the difference in the testimony would not have been a product of honest mistake, but of intentional prevarication. The jury would have to choose between the credibility of the State's witnesses

reporting defendant's statements, and the credibility of defendant's testimony as to what occurred on the night of the murder. Thus, the argument here was not manifestly improper.

Moreover, even if there were error, it was harmless where the jury was instructed that closing arguments were not evidence. See *People v. Knott* (1991), 224 Ill. App. 3d 236, 256-58, 586 N.E.2d 479 (where prosecutor argued that the jury had to totally disbelieve the State's witnesses in order to believe defendant's two alibi witnesses, court held that, even if the error had not been waived, the argument did not rise to the level of prejudicial error, and any error would be harmless where jury was instructed that closing arguments were not evidence). See also *People v. Roman* (1981), 98 Ill. App. 3d 703, 705-06, 424 N.E.2d 794 (no plain error in closing argument).

We also note that defense counsel relied heavily upon arguing that the State's witnesses were—perhaps not lying—but overzealous in their reporting of defendant's statements to them. "I don't know if they are lying, but they didn't necessarily have to lie *** at least in their own minds. *** [B]ut their overzealousness to perform their jobs, to get a conviction may have gotten in the way here just a little bit ***." Defense counsel later argued: "If I, as a state's attorney, want to lie about you *** or as a policeman I want to lie about him ***, and now I'm going to lie, as counsel puts it, he really doesn't mean lie, he just means we are trying to convict the guy of murder with no evidence."

Thus, it was clear that both sides knew that the rift between defendant's testimony and the State's witnesses' testimony of defendant's pretrial statements was the key here.

Defendant next argues that the State improperly bolstered the credibility of its witnesses by arguing:

> "Prosecutors don't view these things. It's people who are watching, and they come in at the risk of their own lives when we can find them, and when they are willing to lay their own lives on the line to come in and testify about it and that's what Harvey Webb did in this case."

Defendant maintains this comment was improper because there was no evidence that Webb had been threatened in any way.

This also "diminished defendant's credibility. Falsely portraying Webb as a heroic witness who risked his life to testify was especially prejudicial, since it inferred [*sic*] that defendant had a guilty conscience and also falsely portrayed defendant as a menace to society and the justice system who would threaten a witness to keep him from testifying."

Prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. (*People v. Pittman* (1982), 93 Ill. 2d 169, 176, 442 N.E.2d 836.) The court must consider the context of the argument, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.

■ It is improper to argue that a witness is afraid to testify because he has been threatened or intimidated by defendant when not based upon evidence produced at trial. (*People v. Ray* (1984), 126 Ill. App. 3d 656, 662, 467 N.E.2d 1078.) In this case, we do not consider these arguments to be prejudicial since they were not highlighted, not repeated, or otherwise emphasized. See *People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38 (the "complained-of arguments above were so insignificant and unimportant at trial they could in no way have constituted a material factor in defendant's conviction, without which the jury might have reached a different result").

Moreover, we find that any prejudicial impact was minimized by the fact that Webb's fright was not attributed to defendant. See *People v. Knott*, 224 Ill. App. 3d at 260 (notwithstanding waiver, the court in *Knott* went on to find that the possibility of prejudicial impact was minimized by the fact that the absent witness' fright was not attributed to defendant specifically, and the "comment can be viewed as a comment on diffused fear of witnesses reluctant to involve themselves in an armed robbery case"). See also *People v. Moore* (1991), 215 Ill. App. 3d 836, 847, 576 N.E.2d 900 (finding any prejudice was harmless where comment "did not relate to anything the jury had perceived; no witnesses appeared to have been so intimidated, and the effect on [defendant's] trial was harmless"); *People v. West* (1971), 3 Ill. App. 3d 106, 119-20, 278 N.E.2d 233; *People v. Acker* (1970), 127 Ill. App. 2d 283, 296, 262 N.E.2d 247; *People v. Trice* (1970), 127 Ill. App. 2d 310, 319, 262 N.E.2d 276.

Defendant relies on two cases where our supreme court recently reversed convictions for murder based on improper prosecutorial arguments that the witnesses were afraid to testify. In *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222, the court reversed a conviction for murder on the basis that the prosecutor argued in closing argument that a witness was reluctant to testify because he was afraid defendant would shoot him in the back if he did so. While there was no objection, the court found it was plain error because the evidence was closely balanced. *People v. Mullen*, 141 Ill. 2d at 398.

That case was unusual, however, because initially when the witness testified, he refused to answer questions. The next day he returned to the stand and testified. The trial court "admonished the attorneys not to ask [the witness] any questions, or make any references, as to why he was initially reluctant to testify. *** [T]he court stated that it would grant defense motion for a mistrial if the prosecutor referred to *** Carr's hesitation in testifying." (*People v. Mullen*, 141 Ill. 2d at 404.) In closing argument, however, the prosecutor ignored these admonishments and argued, without objection:

> "[R]emember perhaps one of the most powerful things in this case was when Tyrone Carr got up on the stand the first time, and he said he did not want to answer.
>
> And use your common sense why he did not want to answer. The same reason no one wanted to talk, at first; they do not want to get involved. Why don't they want to get involved?
>
> *** They do not want one of these [a bullet] *** in their back." *People v. Mullen*, 141 Ill. 2d at 405.

The court found the plain error rule applied because the evidence was closely balanced, and because the trial error was of "such magnitude that the commission thereof denies the accused a fair and impartial trial." (*People v. Mullen*, 141 Ill. 2d at 404.) The court expressly pointed to the prosecutor's "blatant disregard as to proper argument and the orders of the trial court [as] egregious." (*People v. Mullen*, 141 Ill. 2d at 407.) The argument made in *Mullen* was far more severe than the single comment made in the present case. Moreover, no similar violation of a trial court order occurred here. See *People v. Knott*, 224 Ill. App. 3d 236, 586 N.E.2d 479 (distinguishing *Mullen*).

Defendant also relies upon *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900, where our supreme court reversed a conviction for murder of a prison warden, for which defendant received a death sentence. In that case, the prosecutor argued that "every witness that had the guts to come in here and say what he or she saw, every witness that had the guts to point the finger at this defendant, every witness that had the guts to tell the police this is the guy, has had to leave town." (*People v. Smith*, 141 Ill. 2d at 66.) The two witnesses in question had testified that they moved out of Chicago after the shooting. The court sustained an objection to an attempt to elicit testimony that one witness feared for her life. A third witness testified that he left Chicago because he was getting threats, although he did not specify as to the nature or source of the threats. (*People v. Smith*, 141 Ill. 2d at 67.) The court found reversible error.

*Smith* is distinguishable from the present case. The comments complained of here are not nearly as specific as the comments in *Smith*, where the State used the tactic of playing upon the testimony that witnesses had moved since the shooting. In *People v. Smith*, moreover, the court concluded that while these improper comments, standing alone, may not have so prejudiced defendant as to warrant reversal, "these comments compounded the fundamental flaws permeating this trial" in regard to incompetent evidence of gang-related activity. (*People v. Smith*, 141 Ill. 2d at 67.) Here, we are not faced with a case where fundamental flaws permeated the trial or cumulative errors prejudiced the jury.

■ Finally, defendant contends that the 18-year sentence was excessive in light of his strong rehabilitative potential, including the fact that the 33-year-old defendant had only a 1978 misdemeanor theft conviction. He had good family support and a strong, positive reputation in the community. At the sentencing hearing, defendant's mother and brother testified to defendant's good qualities. A petition with 115 signatures of people in the neighborhood stated defendant had strong ties to the block club. Moreover, it was Stevenson who instigated and carried out the murder.

Absent an abuse of discretion, this court will not alter a sentence. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) The fact that this court may have balanced the relevant factors differently does not permit a reduction of the sentence. *People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541.

Armed robbery is a Class X felony and is punishable by 6 to 30 years in prison. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(3).) Defendant was sentenced to 18 years' imprisonment, which is within the statutory range.

In sentencing defendant, the trial court focused on the fact that defendant was not merely a witness to the crime who happened to pick up $10. Instead, the court properly found under the evidence presented that there had been concerted preplanning of this ghoulish crime, stating: "We can't have people acting like vultures in the city of Chicago, and committing these types of offenses and go unpunished." We find no abuse of discretion in imposing an 18-year sentence on defendant.

Accordingly, for the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LORENZ and MURRAY, JJ., concur.