THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL AGUINAGA, Defendant-Appellant.

First District (6th Division) No. 1—88—0919

Opinion filed June 26, 1992.

154

Randolph N. Stone, Public Defender, of Chicago (Bruce Landrum, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Barbara A. Bailey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder, home invasion, armed robbery, and residential burglary. After the jury determined that defendant was ineligible for the death penalty, the trial judge sentenced defendant to a term of natural life imprisonment for murder, terms of 30 years for home invasion and for armed robbery, and a term of 15 years for residential burglary.

On appeal, defendant contends that (1) he was deprived of his fourth amendment protection from unreasonable search and seizure when the police detained him for custodial interrogation at the police station, extracted a written statement, and seized his gym shoes without probable cause; (2) his fourth amendment rights were violated because the police detectives lacked sufficient information to establish probable cause for his arrest; and (3) the sentence imposed for the murder conviction was excessive.

The record reflects that 75-year-old Justina Leonavicius was found murdered in her home on November 16, 1986. Three days later, defendant was arrested and charged with the murder.

Before defendant was charged, the police seized a pair of defendant's gym shoes and obtained a written statement signed by defendant, both of which implicated him in the murder. Prior to trial, defendant filed motions to suppress his written statement and the physical evidence against him, asserting that they were obtained by the police in violation of his fourth amendment protection against illegal search and seizure. Defendant also filed a motion to quash his arrest, contending that the police lacked probable cause.

At the hearing on his pretrial motions, defendant testified that he went to downtown Chicago on November 18, 1986, saw a movie in the afternoon and then walked along the lakefront. At approximately 5 p.m., defendant telephoned his father, who informed him that some detectives had been looking for him because they wanted to ask him a few questions. Defendant placed a call to the telephone number he received from his father and spoke to a detective whose name defendant could not recall. Defendant stated that he understood the detective wanted to ask him some questions, and the detective indicated that he did. The detective then asked defendant how soon he could come to the Area 3 station. When defendant said he did not have

transportation to the station, the detective offered to pick him up. Defendant refused this offer and stated that he would come to the station on his own. Defendant called the police station a couple times before he actually arrived there in a taxicab.

Defendant testified that before he went to Area 3 he drank six or seven beers, smoked some marijuana, and snorted PCP. Defendant testified that he smoked about a half-ounce of marijuana every other day and snorted PCP whenever he got the chance. He stated that PCP made him "hyper" and caused him to hallucinate. Defendant stated further that on November 18, 1986, he smoked a "dime bag" of marijuana and snorted two "dime bags" of PCP. Defendant testified that he had a bag of marijuana with him when he went to the Area 3 station.

Defendant testified that he was feeling "high" when he arrived at Area 3. Inside the station, he asked for the detective and was given directions to the third floor. On the third floor, defendant met a police detective. Although defendant could not remember the detective's name, the testimony of Chicago police detective Thomas Brankin reveals that he was the one who met with defendant. Defendant followed Brankin into a 12-foot by 14-foot room so they could talk privately. Defendant stated that Brankin offered him a chair by the wall. Brankin then asked defendant for his hand and told him it was standard procedure to handcuff everyone they talked to. Defendant remarked that it did not make sense to handcuff someone who came in only to answer a few questions. Brankin nevertheless took defendant's hand and handcuffed him to a ring on the wall.

Defendant stated that his first conversation with Brankin lasted 15 minutes, and Brankin did not advise him of his constitutional rights. During this conversation, defendant requested a lawyer at least five times. Brankin asked defendant why he wanted a lawyer, and defendant explained that his father always told him not to talk to anyone unless he had a lawyer present. According to defendant, Brankin said there were no lawyers available at that time. Defendant told Brankin he did not want to answer any more questions until he got a lawyer.

Defendant was then left alone for 20 minutes after which he and Brankin spoke again for about 30 minutes. During this conversation, Brankin asked defendant where he was on the night of November 15, 1986. Defendant asked for a lawyer about 100 times during this conversation. Defendant subsequently stated that he asked for a lawyer about 40 times.

Defendant testified that after this second conversation, Brankin opened defendant's coat and began looking at defendant's feet and pants. Brankin also asked defendant to raise his foot. Defendant complied, and Brankin asked him to take his gym shoes off. Defendant testified that he and Brankin argued over whether the detective could take defendant's shoes. Defendant told Brankin that he would not tolerate such treatment if he was not handcuffed. Brankin did ultimately take defendant's shoes and coat. Defendant was then left alone in the cold interview room for a long time.

According to defendant, another detective came by the interview room and asked defendant how he was doing. Defendant told the detective he did not want to talk and wanted a lawyer. Defendant told him he did not know anything except that his rights were being violated. This detective left after about seven minutes.

Defendant stated that three detectives came into the room later and said they knew he had "done it" and defendant better tell them why. Defendant again said he knew nothing. One of the detectives grabbed defendant by the shirt and said defendant had better "start talking." Defendant told the detective he wanted to speak to his lawyer because he had not been charged with anything and because he had voluntarily come to the station to talk. The detective then said "[h]ere is your lawyer" and punched defendant in the head. Defendant did not retaliate because he was handcuffed. Defendant then got slapped in the head. The detectives were swearing at defendant, and then he was punched again. Defendant stated that he was hit on the nose a total of three times. When defendant's nose started to bleed, the detectives hit defendant again and then left the room.

Defendant testified that after the detectives left the interview room, he was left alone for two hours. During this time, he was "chewing on a glob of reefer he had hidden in his sock." Defendant stated that he was "buzzing," and the detectives continually checked on him. Defendant also testified that he was listening to a walkman radio, which he had concealed from the police, and could not sleep because he was "high."

Defendant testified further that Michael Duffin was the first detective he spoke with the following morning. Although defendant knew Duffin, he did not recognize him at first. Defendant was acquainted with Duffin because defendant's family had previously lived in a building owned by Duffin. Duffin asked about defendant's family and how defendant had been treated thus far. Because Duffin was a family friend, defendant told him that he would talk to him if he was treated properly. Defendant told Duffin that he wanted his shoes. Duf-

fin told defendant they did not have his shoes but did have a pair of boots and a jacket they obtained from his father's house. Duffin left the interview room and soon returned with the boots and a cup of coffee. Defendant stated that up until that point, he had not had anything to eat except the marijuana.

Defendant testified that he asked whether Duffin had talked to a lawyer for him, and Duffin said a lawyer was coming in. Defendant never told Duffin that he did not want to talk to him anymore. Duffin asked defendant where he was on the night of November 15, 1986. Defendant responded that he was at R & J's Tap. Defendant continued to speak with Duffin and his partner Detective Thomas Ptak for 20 minutes. During this conversation, Duffin wrote down everything that defendant said.

Defendant was then left alone until 10 a.m. when Duffin, Ptak and a lawyer entered the room. Defendant testified that the lawyer did not tell him he was an assistant State's Attorney working with the police. Defendant stopped asking for a lawyer because he thought the man with Duffin and Ptak was his lawyer. Defendant stated that he was still high when he spoke to the lawyer. Defendant told the lawyer he did not understand the words that the lawyer was using. Although he testified that the lawyer said he was defendant's lawyer, defendant later testified that he may have assumed this because he was still "buzzing."

After defendant spoke with Duffin, Ptak, and the lawyer for a while, the lawyer asked Duffin and Ptak to leave the room. The attorney then asked defendant how he had been treated by the police, and defendant said he had been treated badly. Defendant testified that he was never asked if he wanted to give a court-reported statement, but the lawyer wrote down everything defendant said.

During the second conversation with Duffin, Ptak, and defendant, the lawyer presented defendant with a handwritten statement which the lawyer read aloud. Defendant did not read the statement out loud because he was not a good reader. Defendant testified that although he signed the statement five times, he did not read it. Defendant identified his signature on the document but denied that the initials on the document were his. After he signed the statement, the detectives took defendant to McDonald's.

Defendant was then brought back to Area 3 to have his picture taken. Defendant stated that he had to stand in front of the camera five times because he was kicking and fighting and refused to have his picture taken. Defendant spoke with his family at Area 3 and was then transported to the 9th District.

On cross-examination, defendant testified that he was taking thyroxine to control his temper because he loses his temper and "if I go off look out." Defendant further testified that he had been doing PCP for a long time, and it made him "hyper and hallucinate."

Chicago police detective Michael Duffin testified that he started his shift at 8:30 a.m. on November 19, 1986. Prior to reporting for duty, Duffin was not aware that defendant was in the station. As Duffin went to his locker, he heard a male voice ask him to come into an interview room which was approximately 10 feet by 15 feet and had windows. The door to the interview room was open, and as Duffin walked in, he recognized defendant because defendant's family previously lived in a building owned by Duffin. Defendant asked Duffin for his shoes and coat. Duffin got defendant a coat and a pair of shoes that had been retrieved from his father's house. Duffin unhandcuffed defendant, who then put on his coat and shoes. Duffin also got defendant a cup of coffee, and the two talked about defendant's family for about a half hour. After a while, Duffins' partner, Thomas Ptak, walked in the room.

Duffin testified that defendant said he was in a lot of trouble because the police thought he killed a woman. When defendant asked Duffin if he could talk to him about it, Duffin read defendant his constitutional rights from a book. Defendant, who was unhandcuffed, indicated he understood these rights and wanted to waive them and to talk to the detectives. Defendant first asked what evidence they had. Duffin told defendant that there were fingerprints and footprints at the scene and that there was other physical evidence recovered at the scene. At this time, however, Duffin was not aware of any comparisons that had been made with defendant's shoes, and Duffin never told defendant that his shoe prints matched the physical evidence found at the scene. Duffin stated that defendant then confessed to the murder of Justina Leonavicius.

According to Duffin, defendant said that he was drinking at R & J's Tap on the night of November 15, 1986. Around midnight he went into the washroom and snorted "a line of angel dust (PCP)." Defendant was "high" when he came out of the washroom and spilled a drink on the bar. Under the pretense of wiping up the drink, defendant took $10 off the bar. Defendant then became loud and boisterous and started throwing popcorn around the bar. The bartender asked him to leave, and defendant left the bar around 12 or 12:30 a.m.

Defendant told Duffin that he then walked down the gangway by the victim's residence and entered her backyard. Defendant knew the victim and her son because he previously lived across the alley from

them. Defendant said he was weaving as he walked because he was "high." When defendant came up to the victim's apartment, he noticed the door was ajar. Defendant opened the door and walked inside the dark apartment. He began going through drawers looking for something he could steal and then sell in order to buy more angel dust. Defendant said he was making a lot of noise because he was "high." A light came on in the kitchen suddenly, and defendant saw the victim standing in the kitchen doorway. The victim was in the light and defendant was in the dark.

According to Duffin, defendant said he became enraged and went over to the victim and started punching and kicking her. Justina Leonavicius fought back and screamed at him in a heavy Lithuanian accent. After knocking the victim to the floor, defendant reached for a knife and began to stab her. Defendant could not recall how many times he stabbed the victim or where he had gotten the knife. Defendant said he continued to stab the victim until she stopped making noise and stopped moving. Defendant left the victim on the floor and went to wash his bloody hands. He then resumed searching the apartment for money or anything he could sell for drugs. Defendant found $10 in an envelope and went home. Defendant said he could not recall what he did with the money.

Defendant next told Duffin that when he got "high" on angel dust, he felt three emotions: murder, rape, and robbery. Because Duffin knew the victim was found naked, he asked defendant whether he had raped Justina Leonavicius. Defendant seemed embarrassed by this question and said he did not remember. Defendant then told Duffin that if the victim had been raped, he must have done it because he was the only one there.

Duffin showed defendant a picture of Justina Leonavicius which had been taken when she was alive. Defendant identified her as the woman he killed in the apartment. According to Duffin, defendant did not appear upset at all and made the incident seem like it was something he would do every day. Duffin's conversation with defendant lasted about 30 minutes, and defendant was completely sober the entire time he was at the police station.

After this conversation in which defendant admitted killing Justina Leonavicius, Duffin contacted the felony review unit of the State's Attorney's office.

Duffin testified that while defendant was in the station he was offered food and beverages and was given the opportunity to use the washroom facilities. Duffin stated further that he never hit defendant, and he never saw anyone else do so. According to Duffin, defendant

did not request an attorney and never indicated that he wished to assert his right to remain silent.

Duffin testified that Assistant State's Attorney Nicholas Geanopoulos arrived at Area 3 at about 12:30 p.m. At approximately 2:30 p.m., defendant was again advised of his rights and he indicated that he wished to waive them. Thereafter, defendant signed a written statement and a waiver of his constitutional rights. The statement was also signed by Duffin, Ptak, and Geanopoulos.

Assistant State's Attorney Nicholas Geanopoulos testified that he arrived at Area 3 at about 12:30 p.m. on November 19, 1986. Geanopoulos spoke with the detectives and reviewed the police reports. He then had a conversation with Duffin, Ptak, and defendant. Defendant was not handcuffed at this time. As Geanopoulos entered the room, he advised defendant that he was an assistant State's Attorney and was a lawyer working with the police and was not his lawyer. Defendant said he understood that. Geanopoulos advised defendant of his rights from a preprinted form. Defendant indicated that the wanted to waive his rights and wished to make a statement. Defendant then gave an oral account of the events surrounding the death of Justina Leonavicius. This conversation began around 1:30 p.m. and lasted about 30 minutes.

Geanopoulos asked the detectives to leave the room. Geanopoulos then asked defendant how he had been treated by police and defendant said fine. Defendant said he had been given a soft drink and had been allowed to use the washroom facilities. Geanopoulos asked defendant questions regarding whether he was then under the influence of drugs or alcohol or whether any threats had been made by the police to coerce him to make a statement, and defendant said no. Geanopoulos said defendant did not appear to be under the influence of any substances.

Geanopoulos described the procedure of making a court-reported statement and asked defendant if he was willing to make one. Defendant said he understood how it worked and indicated he did not wish to give a court-reported statement. Geanopoulos then described the procedure for a handwritten statement. Defendant did not wish to write anything out, but said that if Geanopoulos wished to write it out, he would be willing to look at it and if it correctly reflected what he had said, he would sign it. Defendant said he could read and write English.

At 2:30 p.m., Duffin and Ptak were allowed back into the room. The four then had a conversation for the purpose of taking defendant's handwritten statement. Geanopoulos had with him a form used

for taking handwritten statements, and he gave it to defendant. Geanopoulos asked defendant to read aloud the advisement of rights section which was preprinted at the top of the first page of the statement form. Defendant read the rights out loud and stated that he understood those rights and wished to make a statement. Defendant then signed his name under the advisement of rights indicating that he understood his constitutional rights.

After this conversation, Geanopoulos put defendant's statement in writing. Geanopoulos, Duffin, Ptak, and defendant then went through the statement. Defendant made a couple of changes which were initialed by all those present. After going through the entire document, all four men signed each page of it. The written statement contained substantially the same facts that defendant had previously related to Duffin. In his written statement, however, defendant also indicated that he had been wearing his white Pony gym shoes and beige reversible jacket at the time of the murder. After making the statement, defendant was photographed and transferred to the 9th District, where he was allowed to spend two hours with his family.

The testimony of Chicago police detective Thomas Ptak corroborated that of Detective Duffin and Assistant State's Attorney Geanopoulos.

Chicago police detective Thomas Brankin testified that during a visit to the crime scene on November 16, 1986, he observed blood on the floor of the ransacked apartment and saw that several prints had been made in the blood by an athletic-type shoe. Brankin also noticed that the shoe prints had the word "Pony" in print and had a swirl-type pattern. On November 17, 1986, Detective Brankin returned to the victim's apartment, canvassed the area, and spoke to various people in an attempt to get information regarding the crime. Brankin went to R & J's Tap, located approximately 30 feet from the victim's apartment, and spoke with Lee Masionis, the owner of the bar. Masionis told Brankin of defendant's actions on the night of November 15, 1986.

Brankin testified further that on November 18, 1986, he was working the evening shift at Area 3. At about 6 p.m., he received a telephone call from defendant, who said he had heard the police wanted to talk to him in regard to the murder of Justina Leonavicius. Brankin said he was interested in talking to defendant and asked if he would come to the station, or whether arrangements could be made to provide transportation for him. Defendant said he was downtown and would find his own transportation. At approximately 7:30 p.m., Brankin received another phone call from defendant. Defendant

stated he was still trying to get public transportation and wanted to know if Brankin still wanted to talk to him. Brankin said yes and again offered defendant a ride, but defendant said he would come in on his own. Defendant arrived at Area 3 at about 9 p.m.

Brankin stated that he and his partner, Detective John Smith, initially spoke with defendant in a large interrogation room on the third floor. Defendant was not handcuffed during this conversation, and Brankin did not advise him of his rights. In response to Brankin's question as to defendant's whereabouts on the night of November 15 or in the early morning of the 16th, defendant denied that he was anywhere near the victim's apartment at those times. Brankin said that he had information that defendant had been in the vicinity of the victim's house on the 15th, but defendant again assured Brankin that he had not been in that area on the night of the murder of Justina Leonavicius. Although defendant told Brankin that he had been out drinking on the 15th, he did not state exactly where he had been drinking. Brankin then told defendant that the police had information that he was at R & J's Tap on the 15th and into the morning of the 16th, but defendant again denied being anywhere near there.

Brankin testified that he noticed inconsistencies between defendant's answers and the information received from Lee Masionis, the owner of R & J's Tap. Brankin and Smith left the room and telephoned Masionis again. After speaking with Masionis, Brankin went back into the interrogation room and advised defendant of his constitutional rights. Defendant said he understood each right and agreed to speak to the detectives. Brankin then questioned defendant a second time about his whereabouts on November 15 and 16. Defendant again denied that he had been at R & J's Tap on November 15 and 16.

During these conversations with defendant, Brankin noticed that defendant's shoes bore the word "Pony" and that the soles had a circular-type swirl pattern which was the same as the pattern of the shoe prints Brankin had seen in the blood on the victim's apartment floor. Brankin asked defendant if he could see his shoes, and defendant gave them to him. When Brankin asked defendant if he had been wearing his "Pony" gym shoes on the night of the 15th, defendant said he had been wearing them for several days. At about 11 p.m. on November 18, 1986, Brankin confiscated defendant's gym shoes.

Brankin gave defendant's shoes to Detectives Smith, Cegielski and Foley, who took them to the crime scene for comparison with the shoe prints made in the blood on the floor of the apartment. Thereafter, Brankin received a telephone call from Smith, who said that

defendant's shoes matched the prints found at the scene of the crime. Brankin then went back into the interrogation room, advised defendant of his *Miranda* rights, and again asked him if he had been at R & J's Tap on the night of November 15. Brankin said that he had information that defendant had been at the bar on the 15th spilling drinks, throwing popcorn, and stealing money off the bar. Defendant then acknowledged that he had been at the bar that night, but said that he left at about 12:30 a.m. on the 16th and went home. Brankin placed defendant under arrest and handcuffed him at about 1 a.m. on November 19, 1986.

Detective John A. Smith testified that at about 11 p.m. on November 18, 1986, he took defendant's shoes and went with Detectives Cegielski and Foley to the victim's apartment. On the way, the detectives stopped by R & J's Tap and spoke with Masionis again. At the crime scene, Smith placed defendant's shoe next to the imprint left in the blood on the floor. Smith determined that the design on the sole of defendant's shoe was similar to the design on the floor and that the size of the shoe was similar to the size of the imprint. The detectives then telephoned Brankin and informed him of the results of their investigation. Brankin and Smith got off duty and left the building at about 2:30 a.m.

The testimony of Detective Greg Cegielski corroborated that of Brankin and Smith. In addition, Cegielski testified that the back of R & J's Tap was approximately 30 feet from the victim's house and was within walking distance of the defendant's home. Cegielski stated that he spoke with Masionis, who described defendant's actions in the bar on the night of November 15, 1986. Masionis also told Cegielski that she received a telephone call at the bar from defendant on November 17, 1986. Defendant apologized for his behavior on the night of the 15th and asked Masionis if he could lend her some money. Defendant then said he had heard about the death of Justina Leonavicius.

Cegielski stated further that Masionis told him she subsequently received another telephone call from defendant, who asked if anyone had been looking for him. Defendant also asked Masionis whether the police had any suspects or whether they knew who had killed Mrs. Leonavicius. Defendant then told Masionis that he had a problem he wanted to discuss with her. Masionis told defendant to come to the bar at 2 a.m. When Masionis related this information to Cegielski, he went to the bar and remained there until a little after 3 a.m., but defendant never arrived. Cegielski then went to various locations looking for defendant but never found him.

Cegielski also testified that he went with Smith and Foley to compare the soles of defendant's shoes to the imprints left in the blood on the floor of the victim's apartment. Based upon a visual comparison, Cegielski concluded that the defendant's shoe probably made the imprint on the floor.

According to Cegielski, he arrived back at Area 3 with Smith and Foley a short time later. On the way back to the station, the detectives stopped by defendant's house and spoke with his father. Cegielski got a second pair of shoes for defendant and another jacket because he intended to send the shoes and jacket defendant had been wearing to the crime lab for further examination. Cegielski contacted the crime lab and was informed that the toolmark expert who would do the examinations would not arrive at work until 7 a.m. Defendant remained handcuffed in the interrogation room. Cegielski testified that he checked on defendant several times, and defendant was asleep most of the night.

Around 5 a.m., Cegielski left Area 3 and got hamburgers, fries, and coffee for himself, Foley, and defendant. At 6:30 a.m., Cegielski and Foley went to the crime lab with defendant's shoes and jacket. An envelope bearing a shoe print and a bloody cushion recovered from the crime scene were already at the toolmark section. The detectives dropped the jacket off at the serology unit and then met with William Sherlock in the toolmark section. After speaking with Sherlock, Cegielski and Foley went to the crime scene, where they had arranged to meet additional members of the crime lab.

At the hearing on defendant's motions to suppress, Geanopoulos and all of the police detectives testified that defendant never appeared to be under the influence of drugs or alcohol while he was at the station. They all testified further that no one ever struck defendant or physically or mentally coerced him to make a statement. They testified that defendant never requested an attorney or indicated that he wished to exercise his right to remain silent. In addition, the detectives testified that they did not tell defendant he could speak to a lawyer only after he told them what happened on the night of November 15, 1986.

Although the record on appeal does not contain a transcript of the trial court's rulings on defendant's motions to quash arrest and to suppress evidence, the record does indicate that the trial court denied these motions.

At trial, the evidence presented by the State was substantially the same as that presented at the hearing on defendant's pretrial mo-

tions, except Detectives Smith, Ptak, and Foley, were not called to testify.

The evidence adduced at trial established that on the evening of November 15, 1986, defendant was at R & J's Tap, which was located next to the victim's apartment. After drinking about six beers, defendant ran out of money and started causing trouble at the bar. After defendant attempted to take another customer's money from the bar, Lee Masionis, the tavern owner, asked defendant to leave. After being asked several times, defendant finally left the bar. Defendant later attempted to come back into the bar at about 12 midnight or 1 a.m., but he was not allowed back in.

At about 10:15 a.m. the following morning, November 16, 1986, Ronald Leonavicius, the 41-year-old son of the victim, left his coach house and walked across the backyard to his mother's 3½-story apartment building. The victim, who spoke only Lithuanian and broken English, was the only person living in the building at the time because the other apartments were being renovated. As Ronald walked up to the back porch, he saw one of his mother's slippers and some red, jelly-like substance. Finding the back door to the apartment locked, Ronald took out his key and let himself in.

Once inside, Ronald saw that a light in the bedroom was lit and that the apartment had been ransacked. There was blood throughout the apartment. The nightstand where the victim kept her money had been ransacked and was covered with blood. Ronald discovered his mother's unclothed, lifeless body on the dining room floor, and he dialed 911 to request emergency assistance. Some of the victim's clothes were found in the living room. The last time Ronald saw his mother alive was around 4 p.m. on November 15, 1986.

When the Area 3 Chicago police officers and the Chicago crime lab mobile unit technicians arrived at the crime scene, they observed the elderly victim lying on the living room floor with multiple stab wounds to her back, chest, and face. There were bruises about the victim's head and face. There were tufts of head hair by the victim's body. The victim's body was naked except for socks on her feet and a house slipper on one foot. A bloody beige sweater with two buttons missing was near the body along with two housecoats, identified in court as the victim's, and which were turned inside out. One of the housecoats was ripped under the right sleeve and around the collar as if it had been ripped off the victim. On the floor of the apartment was blood in which prints had been made by an athletic-type shoe.

In the middle bedroom, evidence technician Walter Collins found a foam rubber cushion and a white business envelope both of which bore

the print of an athletic shoe which matched the shoe prints found in the front room. A broken knife blade was found on the floor. The knife handle was found in the nightstand. Collins further found two buttons, one on a table top and one on the back porch, identical to the buttons on the sweater he recovered in the living room.

There were droplets of blood on the back porch and small amounts of blood on the rear porch stairway that led to the gangway. When Detective Brankin and Ronald Leonavicius tried to turn on the rear porch light, they discovered that it did not work. There was a ladder on the back porch. Ronald started to replace the bulb a few days later and noticed that the bulb worked but had been unscrewed.

Photographs of the crime scene included close-up photographs of the shoe imprints in the blood. Samples of blood were taken from the rear porch, the living room floor, and the middle bedroom. The samples were sent to the serology section of the Chicago crime lab, were tested and were found to be consistent with the victim's blood type, which was AB.

The victim's body was sent to the morgue, and a post-mortem examination was conducted by Nancy Jones, deputy medical examiner for Cook County. Jones' examination revealed that the victim sustained extensive bruising and multiple stab wounds. This examination also established that the victim sustained lacerations and hemorrhaging in the vaginal area. These wounds were caused by tearing but were not inflicted by a sharp instrument.

Jones concluded that the nature and type of wounds inflicted upon the victim were consistent with those sustained by someone who had been tortured before the fatal wound was inflicted. Jones determined that the victim died as a result of multiple stab wounds and from strangulation. Jones also concluded that the stab wounds on the victim's body were consistent with those that would be inflicted by the type of knife found at the crime scene.

At 10:30 p.m. on November 17, 1986, Lee Masionis received a telephone call at the bar from defendant, who said he was sorry for his conduct on November 15 and asked if he could come back in the bar. Masionis told defendant that she did not want him to return to the tavern. When defendant asked Masionis if she had heard about Justina Leonavicius, Masionis replied that she had. Defendant then asked her if she knew how the victim was killed and whether the victim had been raped. Masionis told defendant that she did not know.

About one hour later, Masionis received another telephone call from defendant, who asked if anyone had been looking for him. When Masionis inquired as to why defendant had asked this question,

defendant responded that he had heard that the police had been to his father's house and were looking for him. Defendant told Masionis he had a problem he wanted to discuss with her, and Masionis told him to come to the bar at about 2 a.m. that night. Masionis then telephoned the police.

Detective Craig Cegielski went to the bar and remained there until a little after 3 a.m. but defendant never arrived. Cegielski then went to various locations looking for defendant but was unable to locate him.

The next time Masionis heard from defendant was when he called her from jail on November 23, 1986. Masionis asked defendant how he could kill Justina Leonavicius. Defendant replied, "I didn't mean to do it." Defendant then asked Masionis if he could call her again, but Masionis said that she could not handle another telephone call from him.

William Sherlock, a Chicago police officer assigned to the firearm and toolmark section of the crime lab, examined tests on defendant's shoes and the envelope and cushion found at the crime scene. Sherlock identified 10 individual characteristics and unique markings found on defendant's shoes and on the imprints found at the scene of the crime. These 10 points of comparison included separated lines, broken ridges, notches, and cuts. Sherlock stated that in his opinion, only defendant's shoe could have made the impression on the envelope found in the victim's apartment. Sherlock testified further that there appeared to be minute traces of blood on the soles of defendant's shoes. The shoe print on the cushion had the same class characteristics as defendant's shoe, but Sherlock was unable to say more about the shoe print on the cushion because the cushion's porous material had soaked up the blood. Sherlock also looked at photographs taken of the bloody shoe prints at the crime scene and determined that the shoe prints in the photographs appeared to have the same class characteristics as defendant's shoe.

Detective Cegielski testified that based upon his visual inspection, the pattern on the soles of defendant's shoes and the pattern left in the blood at the crime scene were identical.

Pamela Fish, an employee in the serology unit of the Chicago police department crime laboratory, tested vials of the victim's blood and of defendant's blood. The victim's blood type was AB, and the defendant's was B. Fish also tested samples of blood and blood flakes recovered from various rooms of the victim's apartment and determined that all of the samples were blood type AB.

Fish visually examined defendant's shoes and reversible jacket but did not see any blood. Yet, chemical testing she performed on both

items revealed traces of blood on each section of the shoes and on the entire dark side of the jacket.

The prosecution rested after presenting the above evidence and having its 84 exhibits, which included various pictures and physical evidence, received into evidence.

The defense first called William Fairless, a manufacturer's agent for sporting goods. Fairless testified that he was the exclusive seller of Pony athletic wear in retail outlets in northern Illinois. Some stores, however, bought their shoes nationally and did not obtain their shoes from Fairless. Fairless identified the shoes taken from defendant as a pair of Pony Profiles which were introduced in the fall of 1984 and sold through January 1986. Defendant's shoes were size 11, and about 2,000 pairs were sold in this area in that size. Fairless was not familiar with any defects that could be found on the soles of the shoes. Fairless added that nicks on the soles of the shoes would have resulted from wear and that the shoe would not have been like that when it was sold.

Maria Pulling, who previously worked in the Chicago police department crime lab, examined physical evidence recovered in the investigation of the murder of Justina Leonavicius. Pulling examined the victim's head hair and pubic hair but did not find anything significant. Pulling also tested the fibers found under the victim's fingernails and determined that they were not fibers from defendant's jacket, which she had also examined. Pulling further determined that hair and fibers recovered from the victim's hands also had not come from defendant's jacket.

Debra Aguinaga, defendant's 19-year-old sister, stated that on November 15, 1986, she was living at her father's house with her three-year-old nephew, Phillip, and with her brothers, Steven, Robert, and defendant. On the night of November 15, she was in the kitchen watching television with her father. Steven was sleeping, and Phillip was in the front room watching cartoons on the VCR. Defendant came home between 12:30 a.m. and 1 a.m. on the morning of the 16th.

Debra testified that defendant did not have any cuts, scratches or bruises on him when he came home, and she did not see any blood on him. Her brother was wearing a reversible beige and black jacket, a black shirt, blue jeans, and a pair of boots. Debra stated that defendant did not appear to be under the influence of any substances that night. Debra added that she had never seen defendant under the influence before.

According to Debra, when defendant came home that night, he watched television for about 30 minutes and then went to bed. Debra awoke at 11 a.m. on the 16th, and defendant woke up 30 minutes after she did. Debra admitted that she never told the police that her brother was home that night.

The defense also called James Carey, a shift commander with the Cook County sheriff's department, who testified that in November 1986, defendant was a prisoner in Division 8, which was under Carey's authority. Inmates were allowed to make outside calls during the week but were not allowed to use the phones free on Sundays. Carey stated, however, that he was not working on either Sunday, November 23 or on Sunday, November 30 of 1986. The defense then rested.

Upon consideration of all of the evidence, the jury found defendant guilty of murder, home invasion, armed robbery, and residential burglary.

At the State's request, the trial court conducted a hearing to determine whether capital punishment should be imposed upon the defendant. When this hearing was concluded, the jury determined that defendant was not eligible for the death penalty.

The trial court then conducted a sentencing hearing. After considering factors in aggravation and mitigation, the trial judge made the following comments:

> "If there were any possibility under the law of the State of Illinois for me to impose the death penalty upon this defendant, I would do so. *** I think it is absolutely warranted given the facts in this case and the defendant's background. *** But I'm going to search for the next highest punishment that I can give."

The trial judge stated further that because the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, defendant could be sentenced to natural life imprisonment. The trial court also noted that defendant was eligible for natural life imprisonment based on the fact that the murder was committed during the course of other felonies of home invasion and armed violence. In sentencing defendant to natural life imprisonment for murder, 30 years each on home invasion and armed robbery, and 15 years on residential burglary, the court stated:

> "It is my hope, and I stress this, that this defendant never be granted liberty to exist in our society again. He has forfeited any right to, in my opinion, to participate in the normal activities of American society and ought to be imprisoned for the

rest of his life, every single day of the rest of his life until he dies.''

Defendant filed the instant appeal, challenging the propriety of his detention, interrogation, and arrest, and contending that the sentence imposed for the murder conviction was excessive.

Defendant initially asserts that the trial court erred in denying his pretrial motion to suppress evidence. In support of this claim, defendant argues that he was deprived of his fourth amendment protection from unreasonable search and seizure when the police detained him for custodial interrogation at the police station, extracted a written statement, and seized his gym shoes without probable cause.

On a motion to suppress evidence, the defendant has the burden of proving the search and seizure were unlawful. (Ill. Rev. Stat. 1991, ch. 38, par. 114—12(b); *People v. Hoskins* (1984), 101 Ill. 2d 209, 212, 461 N.E.2d 941.) The standard of review on a motion to suppress is whether the trial court's ruling was manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 162, 535 N.E.2d 837; *Hoskins*, 101 Ill. 2d at 212.

The fourth amendment requires that any seizure be "reasonable," and the reasonableness of a seizure depends upon a balancing of the public's interest and the individual's right to personal security free from arbitrary interference by police officers. (*People v. Smithers* (1980), 83 Ill. 2d 430, 434, 415 N.E.2d 327.) In determining whether an arrest has taken place, the question is not simply whether the officer's conduct was reasonable under the circumstances, but whether a reasonable, innocent person in the defendant's situation would have considered himself free to leave. See *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766; *People v. Townes* (1982), 91 Ill. 2d 32, 37, 435 N.E.2d 103; *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870.

The mere fact that the questioning took place in a police station is not in and of itself sufficient to convert the questioning into an arrest. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 402, 562 N.E.2d 1113; *People v. Longoria* (1983), 117 Ill. App. 3d 241, 250, 452 N.E.2d 1350.) Numerous factors must be considered, including the location of the interrogation, any statement or nonverbal conduct by the police which indicated that the accused was not free to leave, the extent of the knowledge of the police officers and the focus of their investigation, and the intentions of the officers. (*Matthews*, 205 Ill. App. 3d at 402-03.) A reviewing court must also consider the time, length, mood and mode of the interrogation, the number of police officers present and the presence or absence of friends or family of the accused, the

manner in which the person questioned got to the place of interrogation, whether he was allowed to walk within and from the location of interrogation unaccompanied by police, and the age, intelligence, and mental makeup of the accused. *Matthews*, 205 Ill. App. 3d at 403; *People v. Smith* (1987), 150 Ill. App. 3d 524, 528, 501 N.E.2d 1010; *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226.

In the case at bar, defendant testified that after he voluntarily complied with Detective Brankin's request and went to the Area 3 station to answer a few questions, he was immediately handcuffed to a ring on the wall of an interrogation room. Defendant also testified that he was never advised of his constitutional rights, the officers hit him more than three times and caused his nose to bleed, he was refused the opportunity to speak with an attorney, he was not offered food, beverages, or the use of washroom facilities for several hours, his coat and gym shoes were taken from him without his consent, and he was then left in a cold interrogation room overnight. Defendant stated further that he signed the written statement without reading it because the officers told him to sign it, and before he went to the station on November 18, 1986, he smoked a "dime bag" of marijuana and snorted two "dime bags" of PCP.

The detectives who investigated the murder of Justina Leonavicius testified that defendant was not handcuffed until he was formally arrested at 1 a.m. on November 19, 1986. In addition, they testified that defendant was permitted to use the washroom facilities and was offered beverages before he signed the written statement. The detectives stated that defendant was repeatedly advised of his constitutional rights and that he indicated that he understood those rights and wished to waive them. The officers testified that defendant did not request an attorney or indicate that he wished to exercise his right to remain silent. They stated further that defendant was not hit or physically or mentally coerced into making a statement. Brankin testified that defendant consented to the taking of his gym shoes. The detectives also stated that defendant voluntarily signed the written statement and that he never appeared to be under the influence of alcohol or of any controlled substances.

■ The trial judge, who was charged with the obligation of determining the credibility and weight of the testimony and with resolving conflicts therein (*People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280), denied defendant's motion to suppress. Based upon the record before us, we find that the evidence in the record provided ample support for the trial court's determination that defendant's fourth amendment rights were not violated by the investigation and custodial

interrogation conducted by the police detectives. Accordingly, the court's ruling on the motion to suppress was not against the manifest weight of the evidence and is affirmed. *People v. Creach* (1980), 79 Ill. 2d 96, 102, 402 N.E.2d 228.

Defendant next contends that the police detectives lacked probable cause when they arrested him at 1 a.m. on November 19, 1986.

The issue of whether probable cause exists is a commonsense, practical question to be determined upon examination of the totality of the circumstances presented. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Probable cause exists if a police officer has knowledge of facts which would lead a reasonable person to believe that a crime has been committed and that it was committed by the defendant. (*People v. Neal* (1985), 111 Ill. 2d 180, 193, 489 N.E.2d 845.) An arrest cannot be made merely on the officer's suspicion that the individual may have committed the offense, but evidence sufficient to convict is not required. (*People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275.) In determining whether an officer had probable cause to arrest, the officer's factual knowledge based upon previous law-enforcement experience may be sufficient. *People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147.

Defendant argues that prior to his formal arrest, the police did not have knowledge of sufficient facts that would lead a reasonable person to believe that the victim was killed by defendant. We find this argument unpersuasive.

The record establishes that Detective Brankin had information that defendant had been at R & J's Tap on the night of the murder of Leonavicius. In addition, Brankin was aware that this tavern was only 30 feet from the victim's house and was within walking distance of the defendant's home. Brankin knew that defendant repeatedly denied being at the tavern on the night of the crime until after Brankin advised defendant that he knew defendant was present at the bar that night. The detectives learned from Masionis of defendant's unusual behavior on the night of the murder. The detectives were also aware of defendant's telephone calls to Masionis in which he asked her whether anyone had been looking for him and inquired as to what information was known about the murder.

The detectives were also aware that during a telephone call made on November 17, 1986, defendant told Masionis that he had heard the police went to his father's house and were looking for him. Yet, defendant learned from his father that the police were looking for him on the evening of November 18, 1986. Masionis told the detectives that defendant had never before telephoned the bar to see if anyone

was looking for him. Masionis also told the detectives that defendant said the victim did not have any money and that he wanted to discuss a problem with her. Finally, Brankin was aware that the pattern on the soles of defendant's gym shoes was the same as that found in the imprints left at the crime scene and that, after visually comparing defendant's shoes to the imprints, Detectives Smith, Cegielski, and Foley concluded that the pattern on the soles of defendant's shoes matched the prints found at the scene of the crime.

This evidence indicates that Detective Brankin had knowledge of facts which would lead a reasonable person to believe that a crime had been committed and that it had been committed by the defendant.

Brankin's determination of probable cause was based in part upon the similarity found after his comparison of the sole of defendant's shoe with the shoe imprint discovered at the crime scene. The conclusion drawn by Brankin was subsequently borne out by the trial testimony of William Sherlock, the officer assigned to the firearms and toolmark section of the crime lab, who examined defendant's shoes just after the arrest. Sherlock identified 10 individual characteristics and unique markings found on defendant's shoes and on the imprints found at the scene of the crime, including separated lines, broken ridges, notches, and cuts. Sherlock stated that in his opinion, only defendant's shoe could have made the impression on the envelope found in the victim's apartment. Sherlock also testified that there appeared to be minute traces of blood on the soles of defendant's shoes. This shoe print evidence, standing alone, was sufficient to support a conviction for murder. See *People v. Campbell* (1992), 146 Ill. 2d 363.

An arresting officer is not required to have sufficient evidence to convict the accused beyond a reasonable doubt, but only evidence which is adequate to support the belief that the defendant committed the offense. (*Moody,* 94 Ill. 2d at 7.) In the case at bar, Brankin had knowledge of the shoe print evidence as well as many other facts which implicated defendant in the murder. Based upon the evidence presented to the trial judge at the pretrial hearing, we hold that the police had probable cause to arrest defendant at 1 a.m. on November 19, 1986, and the trial judge correctly denied defendant's motion to quash his arrest.

Finally, defendant asserts that the sentence imposed for the murder conviction was excessive and that the trial judge erred in failing to consider his potential for rehabilitation in sentencing him to natural life imprisonment.

It is recognized that in considering the propriety of punishment a court of review must give great weight to the judgment of the trial

court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 110, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*Perruquet*, 68 Ill. 2d at 153.) Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of review. *Perruquet*, 68 Ill. 2d at 154; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.

A reasoned judgment as to a proper sentence must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154; *Bolyard*, 61 Ill. 2d at 589.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. (*Perruquet*, 68 Ill. 2d at 154; *People v. Duncan* (1981), 97 Ill. App. 3d 896, 899, 424 N.E.2d 67.) The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541; *Bergman*, 121 Ill. App. 3d at 109.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. *People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1, 4; *Bergman*, 121 Ill. App. 3d at 109.

 The record in the instant case reflects that in sentencing defendant, the trial judge stated that he had recalled and considered the evidence presented at trial, had read and considered the presentence report, had considered the testimony of the witnesses and the statements of counsel relevant to sentencing, the factors presented in aggravation and in mitigation, the age and criminal history of the defendant, defendant's cooperation with the police at the time of his arrest, the seriousness and brutality of the crime, and the sentencing alternatives available. The judge also made the following comments:

> "If there were any possibility under the law of the State of Illinois for me to impose the death penalty upon this defendant, I would do so. *** I think it is absolutely warranted given the facts in this case and the defendant's background. *** But I'm going to search for the next highest punishment that I can give."

The record indicates that the sentencing judge was fully aware of defendant's age, his prior criminal background, his history of drug use, and his family situation. Yet, these considerations had to be balanced against the seriousness of the offense of which defendant had been convicted. Our review of the record reflects that the trial judge properly considered all relevant factors in making his sentencing decision, including the rehabilitative potential of the defendant. We conclude that the penalty imposed for the murder conviction does not reflect an abuse of the trial court's discretion. See *People v. Younger* (1986), 112 Ill. 2d 422, 428, 494 N.E.2d 145.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.