THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER ARNOLD, Defendant-Appellant.

First District (4th Division)   No. 84—2456

Opinion filed December 19, 1985.

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Roger Arnold, was found guilty by a jury of the crime of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and was sentenced to a 30-year term of imprisonment.

On appeal, the defendant contends that: (1) the State did not prove him guilty beyond a reasonable doubt; (2) there was insufficient evidence to support the giving of a murder instruction; (3) the trial court erred in allowing one of the State's witnesses to testify as to prior threats made by the defendant; (4) the trial court erred in allowing certain photographs of the decedent with his family to go into the jury room; and (5) the trial court abused its discretion in sentencing the defendant to a 30-year term of imprisonment.

Before a recitation of the facts of this case it is necessary to explain an incident referred to by the parties as the "Tylenol poisonings." We note that because the facts surrounding that incident were common knowledge in the local community, we may take judicial notice of those facts. (See McCormick, Evidence sec. 29, at 761 (2d ed. 1972).) Specifically, during the first week of October 1982, seven Chicago-area residents died after ingesting Extra-Strength Tylenol capsules that had been laced with cyanide. The authorities believed that the tampering had been deliberate. The defendant, Arnold, was incorrectly accused of contaminating the Tylenol. As a result, he was arrested but later released. Even though he was released, the defendant's life, to say the least, was severely disrupted.

The person who gave the defendant's name to the police was a man by the name of Marty Sinclair. At the time of the shooting at issue in this appeal both Sinclair and the decedent, John Stanisha, weighed over 350 pounds, wore a beard, and were approximately the same height. It was the State's theory that defendant shot Stanisha thinking that he was Sinclair.

The evidence presented by the State included the testimony of the

three men who were with the decedent on the night of the shooting, Fritz Brunner, Richard Rose, and Earl Pionke. These men and the decedent met at various bars at different times throughout the night of June 17, 1983. Eventually all were together at a bar named Lilly's on Lincoln Avenue in Chicago. All three testified to the effect that contrary to the defendant's testimony they did not see the decedent and the defendant exchanging words at Lilly's.

The accounts of the events of the evening given by Brunner, Rose, and Pionke were essentially the same. The decedent, Rose, and Pionke left the bar. Brunner followed shortly thereafter as he had stopped to go to the washroom. As Brunner approached the others from behind, he heard a shout something to the effect that "you turned me in." After hearing a shot and seeing the decedent injured, Brunner followed the defendant as the defendant walked calmly to his car with the gun pressed to his leg. After obtaining the license plate number, Brunner returned to the scene and accompanied the others to the hospital where the decedent died. Although none of the men testified that they actually saw the defendant shoot the decedent, all three identified the defendant as the man at the scene who walked away after the decedent was shot.

Also testifying for the State was Rand Kautz, the manager of the gun shop at which the defendant purchased the gun. Kautz testified that the gun could not discharge accidentally unless there was an internal malfunction. The gun was purchased approximately three months before the incident.

The State's evidence also included the testimony of Marty Sinclair. Sinclair testified that he was the person who turned the defendant into the authorities. He also stated that since that time, he had seen the defendant several times at the bar which Sinclair owned, but, he did not see him on the night of the shooting. Further, Sinclair testified that he weighed approximately 350 pounds, was 5 feet, 8 inches tall, and wore a beard on the night the decedent was shot.

During the State's rebuttal case, Officer Vollick of the Chicago police department testified as to a statement made by the defendant while he was being questioned in regard to the Tylenol poisonings. Officer Vollick stated that the defendant told him "he sure would like to be in on the homicide of that man, the person that had informed on him, and to put him through what he was going through."

The defendant testified that on the night of the shooting he drove to Lilly's and parked his car approximately one and one-half blocks from the bar. He stated that he was armed with a .45 automatic that he had purchased in April of 1983. Although the defendant testified

that he was not really familiar with automatic weapons, the evidence revealed that he owned five other guns. While at Lilly's the defendant encountered the decedent, who allegedly began taunting the defendant about his involvement in the Tylenol poisonings. Later, outside the bar, the decedent continued to taunt him and appeared to be coming toward the defendant. At that point the defendant reached inside his T-shirt to pull out his gun and the gun went off accidentally, fatally wounding the decedent. The defendant testified that he did not intend to shoot the decedent. He then drove his car to a bridge on 35th Street, where he threw his gun into the river. Early the next morning the defendant phoned his lawyer and surrendered to the Chicago police.

■ We first address the defendant's contention that the State did not prove his guilt beyond a reasonable doubt. The defendant argues that his testimony that the shooting was accidental gave rise to a reasonable hypothesis of innocence which the State did not rebut. The defendant is correct in his contention that "[w]hen the evidence finding a defendant guilty is circumstantial, the facts proved must be consistent with the defendant's guilt and inconsistent with any reasonable hypothesis of innocence." (*People v. Crow* (1985), 108 Ill. 2d 520, 533-34, quoting *People v. Evans* (1981), 87 Ill. 2d 77, 83, 429 N.E.2d 520.) The evidence in this case, however, was not entirely circumstantial. Of the elements necessary to establish murder, only the element of intent was based upon circumstantial evidence. In this case, as in *People v. Spataro* (1978), 67 Ill. App. 3d 69, 384 N.E.2d 553, the defendant's testimony that the gun went off accidentally and shot the decedent is considered direct evidence. (See also *People v. Triplett* (1980), 87 Ill. App. 3d 763, 409 N.E.2d 401.) Consequently, the reasonable hypothesis of innocence has no application to this case.

■ Moreover, we believe that there was sufficient circumstantial evidence from which the jury could infer the requisite mental state. The State produced evidence that the defendant made a threat to injure the person who turned him in; later purchased a gun; shouted some words at the decedent to the effect that "you turned me in"; fired the shot that killed the decedent; and calmly walked away after the incident. There was also expert testimony that it would be unlikely for the gun to go off accidentally. Additionally the testimony of the three men who were with the decedent that evening rebutted the defendant's claim that the decedent taunted the defendant at the bar. Taken as a whole, a jury could reasonably find that the shooting was not accidental and that the defendant was guilty beyond a reasonable doubt.

■ A related argument advanced by the defendant is that it was error to give the jury a murder instruction because there was insufficient evidence to support the instruction. We do not agree. Generally, very slight evidence regarding a given theory will justify the giving of an instruction on that theory. (*People v. Strong* (1979), 79 Ill. App. 3d 17, 24, 398 N.E.2d 216.) We believe that the defendant's own testimony together with the circumstantial evidence set forth above constitutes sufficient evidence to warrant the giving of the murder instruction.

The defendant's third contention is that the trial court erred in allowing the State's witness, Officer Vollick, to testify as to the statement the defendant made that he wanted to be in on the homicide of the man who put him through the Tylenol ordeal.

■ It is well settled that threats made by an accused against the deceased prior to the commission of the crime are admissible into evidence to show malice and criminal intent. (*People v. Williams* (1980), 85 Ill. App. 3d 850, 856, 407 N.E.2d 608.) A mere charge of a general nature not directed to any particular person, however, is not admissible to show malice. (*People v. Sorrells* (1920), 293 Ill. 591, 596, 127 N.E. 651.) To be admissible the threat must be in some way linked to the victim. *People v. Williams* (1980), 85 Ill. App. 3d 850, 856, 407 N.E.2d 608.

The defendant in this case argues that the decedent was not within the scope of the threat or linked to the threat because the defendant did not know, until the day of the trial, who had turned him in to the authorities. However, we believe that other portions of the defendant's testimony cast doubt upon this assertion. The defendant testified:

"Q. [On cross-examination by Mr. Stock, assistant State's Attorney]: When did you learn, Mr. Arnold, that Marty Sinclair had given your name to the Tylenol Task Force?

A. I never really did ever learn it until today.

Q. When did you first presume or receive knowledge that Marty Sinclair had given your name to the murder-Tylenol Task Force?

A. I had heard rumblings on the street, but I heard rumblings on the street about other people.

Q. Mr. Arnold, did you understand my question? I asked you when—

Mr. Royce [attorney for the defense]: Objection. I think he's answered it, Judge.

The Court: When, about Marty Sinclair?

Mr. Stock: That's correct, your Honor.

The witness: When did I hear?

Mr. Stock: Yes, sir.

A. Anything about Marty Sinclair?

Q. No, in regard to the Tylenol investigation in your name becoming involved?

A. Oh, that. Maybe November, December.

Q. Of 1982, is that correct?

A. Correct.

* * *

Q. Mr. Arnold, did you have some reason to believe that Marty Sinclair turned you in on the Tylenol case prior to today?

A. I have heard people say that he did. I have heard people say that other people did."

■ We believe that this testimony is some evidence from which the jury could reasonably infer that prior to the shooting the defendant knew that Sinclair had turned him in. Accordingly, this evidence sufficiently links the threat to do harm to the person who turned the defendant in, with the decedent, the person who resembled the person who in fact turned the defendant in. Moreover, the evidence that just before the shooting the defendant shouted something to the effect that "you turned me in" further supports the conclusion that the defendant knew Sinclair had turned him in. Consequently, it was not an abuse of discretion to allow the statement into evidence.

Additionally, the defendant argues that the trial court erred in allowing two photographs of the decedent with his family to go into the jury room. The defendant contends that the prejudicial nature of the pictures outweighed their probative value. Also, the defendant argues that the prejudice could have been eliminated had the court removed or covered portions of the photographs that showed the decedent's family.

■ Whether evidentiary items should be taken into the jury room rests within the discretion of the trial court. (*People v. Williams* (1983), 97 Ill. 2d 252, 292, 454 N.E.2d 220.) This discretion will not be disturbed absent the showing of an abuse to the prejudice of the defendant. (*People v. Greer* (1980), 79 Ill. 2d 103, 117, 402 N.E.2d 203.) Moreover, the trial court can allow tangible objects which have been duly admitted into evidence to go into the jury room if those objects are relevant to any material issue. *People v. Watson* (1982), 107 Ill. App. 3d 691, 696, 438 N.E.2d 453.

■ The issue in this case to which the photographs were directed

was the identity of the decedent as compared to Marty Sinclair. The jury had the opportunity to see Sinclair on the stand and hear his testimony as to his height, weight, and facial hair on the day of the shooting. The photographs were therefore necessary and relevant to the State's theory of mistaken identity. In addition, notwithstanding that in some cases courts have excised the legend from a defendant's mug shot in order to eliminate prejudice, we find that the presence of the decedent's family in the pictures was not so inflammatory that the failure to alter the pictures was an abuse of discretion.

Lastly, the defendant argues that the trial court abused its discretion by imposing a sentence greater than the minimum provided under the statute. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) The defendant points to several factors in mitigation which would justify the imposition of the minimum sentence.

■ It is within the discretion of the trial court, after considering the facts and circumstances of the case and the defendant's prior history, to impose a particular sentence. (*People v. Almo* (1985), 108 Ill. 2d 54, 70, 483 N.E.2d 203.) Moreover, it is outside the province of the reviewing court to reweigh these factors. Upon review of the record before us, we find that the trial court, in making its determination, did in fact properly consider and evaluate the same factors now asserted by the defendant. Consequently, in the absence of an abuse of discretion this court cannot modify the sentence. *People v. Cox* (1980), 82 Ill. 2d 268, 280-81, 412 N.E.2d 541.

The judgment and sentence of the circuit court of Cook county are affirmed.

Affirmed.

LINN and McMORROW, JJ., concur.