THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HORATIO COSME, Defendant-Appellant.

First District (5th Division)   No. 1—89—3131

Opinion filed May 28, 1993.

Rita A. Fry, Public Defender, of Chicago (Thomas Finegan, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Margaret Faustmann, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Defendant, Horatio Cosme, was arrested and charged with first degree murder along with his codefendants, Felipe Rosales, Danny Leal, Rigoberto Moreno and Manuel Velasquez, in connection with the death of Michael Marrone. After obtaining a severance from his codefendants, Cosme was convicted of first degree murder and sentenced to 50 years in the Illinois Department of Corrections. On appeal, defendant argues that he was not proved guilty beyond a reasonable doubt and that he was denied a fair trial because he was prejudiced by the following: (1) the admission into evidence of a previous altercation between the victim and one of the severed codefendants; (2) the submission of jail intake photographs of the severed codefendants to the jury during its deliberation; (3) the testimony of the investigating officer which implied that the severed codefendants had implicated defendant; (4) and comments made by the prosecution in its closing argument. Defendant also argues that his sentence was excessive. For the reasons set forth below, we affirm.

FACTS

Defendant was indicted for first degree murder in connection with the death of 17-year-old Michael Marrone. Marrone, a member of the C-Notes street gang, was killed while sitting in the back seat of a car which was surrounded by members of a rival street gang, the Spanish Cobras. The Cobras were pelting the car with bottles and bricks and hitting it with baseball bats when the defendant, an admitted Spanish Cobra, allegedly ran up to the car and fired several shots into its passenger side killing Marrone. At trial, the following testimony was heard.

Paul Garza testified that in the early morning hours of January 14, 1989, he and the victim went out to buy some beer with three of their friends. Garza stated that as they were driving, they were curbed by a car from which four individuals emerged and showed Garza and his friends a five-star badge and a gun. Garza testified that the individuals then searched him and his friends and began hitting them. He stated that the individuals then threw the keys to the Garza car into its trunk and locked it.

Garza testified that he and his friends pried open the trunk, retrieved the keys and started the car. According to Garza, two of his friends were looking in the immediate area of the car for one of their wallets when a different group of individuals approached the car. At this time, Marrone was sitting in the back seat of the car on the passenger side; Garza was sitting next to him in the middle of the back seat. Garza stated that one of the Cobras, later identified as Felipe Rosales, went up to the passenger side of the car and told Marrone that he knew him to be a C-Note. Garza testified that Rosales then started hitting the car with a baseball bat and the others also began beating on the car. Garza stated that one of the severed codefendants, later identified as Danny Leal, smashed the front windshield of the car. They were also throwing bricks and bottles at the car. Garza testified that he noticed that Marrone was shot when they took off and Marrone fell on him, but that he did not hear the shot.

Garza stated that he was a member of the C-Notes and identified Rosales as a member of a rival gang, the Spanish Cobras. Garza identified a photograph of Rosales as the individual who first accused Marrone of being a C-Note and as the one who was hitting the car with the bat. Garza also identified a photograph of another Spanish Cobra, Danny Leal, as the one who smashed the front windshield at the time in question. Over objection, Garza testified that during the summer of 1988, Marrone and Felipe Rosales got into a fight at the

Oak Street Beach. On redirect, Garza stated that he did not see a gun in the possession of either Leal or Rosales.

Juan Zapata testified that he was a Spanish Cobra for about one year at the time of trial. He identified defendant and his severed co-defendants, Felipe Rosales, Danny Leal, Rigoberto Moreno and Manuel Velasquez, as members of the Spanish Cobras and stated that they were all "friends of each other." He had known defendant for about four months at the time of the shooting through his membership in the Spanish Cobras.

Zapata stated that on the night of January 13, 1989, he was at the El Domino bar playing pool with Rosales, Leal, Moreno, and Velasquez, when defendant entered the bar and said that C-Notes were in the neighborhood.

Zapata stated that everyone ran outside and defendant told him that he was going to get a gun. According to Zapata, defendant ran towards Ashland Avenue and the rest of the group proceeded to Erie Street where the C-Notes were curbed in their car.

Zapata stated that when they arrived on Erie Street they saw a car in the middle of that street and started to throw bricks at it. He stated that Rosales was hitting the car with a bat and Leal was hitting it with a stick. Defendant was six feet away from him when he came up, "cracked the gun down to see if it had any bullets, *** put it back together, and ran towards the car." Defendant then ran to the passenger side of the car and fired the gun twice inside the car.

Zapata said that he did not go to the police because he was scared of the defendant. He testified that after the police picked him up, he told them what happened and gave them a handwritten statement. He subsequently testified before the grand jury and related the events of that night. He stated that his trial testimony was consistent with what he told the police and what he told the grand jury. He admitted that the day before trial he told the public defender "a different story," but explained that he did so because he was afraid of defendant.

Zapata identified photographs of Rosales, Leal, Velasquez, Moreno and of the El Domino bar. The picture of the El Domino bar showed that "Spanish Cobras" and markings signifying C-Note killers had been spray painted on the side of the building.

On cross-examination, Zapata admitted that he was also known as Omar Santiago. He said that he was six feet away from the car when the shooting took place. He admitted that a week before trial he told an investigator from the public defender's office that he was a block away from the car when the shooting occurred. He also admitted that

the day before he testified at trial, he told defendant's public defender that his trial testimony was going to be the same as his testimony before the grand jury and that he had lied when testifying before the grand jury. He explained that he told the public defender and his investigator that he lied because of his fear of the defendant.

Rosalio Najera testified for the State that on the night in question he was with Rigoberto Moreno when he saw the car in which the victim, Marrone, and his companions were riding being curbed by a second car. He stated that the occupants of the second car proceeded to beat up Marrone and his companions. After recognizing that Marrone and his companions were C-Notes, Najera and Moreno ran to get the Spanish Cobras.

Najera stated that he and Moreno went to the El Domino bar, where they saw defendant standing outside. Moreno talked to defendant and then defendant and Moreno went into the bar. Najera testified that defendant, Moreno and Leal came out of the bar and they were whispering. Moreno told him to leave at which time Najera returned to where the C-Notes were curbed. Najera testified that the Spanish Cobras, among them defendant, Rosales, and Leal, then arrived. Leal broke the front windshield. According to Najera, Rosales was holding a bat and standing next to defendant. He could not see anything in defendant's hands because the car was in his line of vision. He saw "shots" come from the place where defendant and Rosales were standing and ran to the back of an alley.

On cross-examination, Najera stated that he saw the shooting from across the street. He testified that he knew Omar Santiago and did not see him at the bar where the shooting occurred. He stated that he heard noises that sounded like three gunshots and saw some flashes of light. He said that of the 8 to 10 people around the car, only Rosales and defendant were standing on the side of the car from which the flashes and gunshots emanated.

Officer Dennis Keane testified that on January 15, he went to the home of defendant's mother and spoke with her and Zenida Sida, the defendant's girl friend. Over the course of the next week, the officers unsuccessfully attempted to locate defendant. Keane testified that during this time they were also looking for Rosales, Leal, Velasquez, and Moreno. Keane testified that all except for Rosales were arrested on January 23, 1989. The following exchange then occurred during Keane's direct examination:

"Q. (by Prosecutor) And did you have conversations with those persons after they were arrested?

[DEFENSE COUNSEL]: Objection.

THE COURT: I'm going to sustain it.

Q. After they were arrested, detective, what efforts, if any did you make to apprehend Horatio Cosme?

A. At that point we requested *** a warrant for Mr. Cosme."

After the State rested, defendant called James Madden, an investigator for the public defender, as his first witness. Madden testified that less than a week before trial, Santiago (Zapata) told him that he was a block away when he heard the gunshots and that he could not identify the shooter. Santiago told him that he did not see defendant on the night of the shooting.

Anthony Rocco, an assistant public defender, testified that the day before the trial began, Santiago said that he did not see who committed the shooting and that he had lied to the police and the grand jury. Santiago said that he lied because he did not want to get into trouble and that he was going to lie at trial. On cross-examination, Rocco admitted that when he talked to Santiago, they were only 30 to 40 feet from the lockup where the defendant was kept while awaiting trial.

Zenida Sida testified that on the day of the shooting she was living with defendant and was his girl friend. She and defendant first left the apartment on January 13, at about 9 p.m. when they went to a friend's house to borrow a movie. She went upstairs to the friend's apartment alone, borrowed the movie and came back downstairs about 45 minutes later when defendant whistled for her. They then walked back home, watched the 10 p.m. news, and then put on the borrowed movie. She stated that defendant watched the entire movie with her and they then went to bed. Defendant never left the apartment until the next morning. According to Sida, she spoke with Detective Keane on the morning of January 15, 1989, and told him that there was no way that defendant could have been involved in the homicide because he was with her at the time of the shooting.

On cross-examination, she claimed that she did not really know any of defendant's friends, but had heard of and seen Danny Leal. She did not know Moreno or Rosales and did not know that defendant was in a street gang.

On redirect, Sida denied telling Detective Keane when questioned on January 15, that she had not seen her boyfriend since 6 p.m. on the night of the shooting. She never saw defendant with a gun and, to her knowledge, he did not own one.

Defendant took the stand in his behalf. He testified that he was 18 years old. On the day of the shooting, he was with his girl friend at the apartment they shared. Defendant stated that they first left

their apartment that day at 9 p.m. to go to a friend's house. He said that Sida went upstairs for about 45 minutes while he stopped at the El Domino bar, which was down the block from their friend's house where he had four or five drinks and played pool. He did not know anyone in the bar and spoke only to the manager of the bar.

He left the bar and then went back to the friend's house, where he whistled for Sida to come down. They then walked back to their apartment. Defendant stated that nothing unusual happened on that night. They watched the news, the borrowed movie and they then went to bed. He got up about 9 a.m. the next morning and went to his uncle's house.

He first found out that the police were looking for him the following morning when he received a call from his mother. He said that he turned himself in about one week later after speaking with an attorney. He admitted that he used to be a member of the Spanish Cobras, but stated that his membership ceased just before he was locked up. Defendant testified that he never owned a gun and did not shoot Michael Marrone.

After the defense rested, the State called Detective Keane in rebuttal. Keane stated that on January 15, 1989, when he questioned Sida, she said that she had not seen the defendant since 6 or 7 p.m. on the night of the shooting. On cross-examination, Keane admitted that he did not note that fact in his police report.

During its closing argument, the prosecution made numerous statements which defendant assigns as error on appeal. These statements will be set out and addressed in the body of the opinion. After closing arguments, the State asked that the jail intake photographs of Rosales, Leal, Moreno and Velasquez be allowed to go back with the jury during its deliberations. The trial court allowed the submission of these photographs over defense counsel's objection.

The jury found defendant guilty of first degree murder and the trial court sentenced him to 50 years in the Illinois Department of Corrections. Defendant then filed this appeal.

OPINION

We first consider defendant's contention that he was not proved guilty beyond a reasonable doubt because there was no credible testimony offered which showed that he shot the victim. Of the two witnesses which placed him at the scene of the crime, defendant asserts that Zapata's testimony was unreliable because he repeatedly contradicted himself at trial and that Najera's testimony only placed him at

the scene of the crime, it did not establish that he fired a gun at the victim.

The "relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Sutherland* (1992), 155 Ill. 2d 1, 17, 610 N.E.2d 1.) In determining the sufficiency of the evidence of guilt, the jury must assess the credibility of the witnesses and resolve any factual disputes in the evidence. (*People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341.) A reviewing court is not to "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation], and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell* (1992), 146 Ill. 2d 363, 375, 586 N.E.2d 1261.

Defendant argues that testimony of Zapata, who testified that he actually saw defendant shoot the victim, is not credible because he admittedly made statements prior to trial which contradicted his trial testimony. As noted, the day before the trial, Zapata told the public defender "a different story" and stated that at trial he was going to tell the same story at trial that he told at the grand jury, which was "a lie." Also, defendant points to the fact that Zapata testified at trial that he was six feet away from defendant, but admitted on cross-examination that he told an investigator for the public defender that he was a block away when the shot was fired.

The reliability of a witness' identification of defendant is a question for the jury. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590, 539 N.E.2d 276.) Contradictions between the witness' trial testimony and prior statements are matters of credibility for the jury to resolve. (*People v. Fairbanks* (1986), 141 Ill. App. 3d 909, 491 N.E.2d 74.) It is the jury's prerogative to "accept or reject as much or as little of the witness' testimony as it pleased," and to draw reasonable inferences from that testimony. *People v. Hanna* (1983), 120 Ill. App. 3d 602, 613, 457 N.E.2d 1352.

■■ Obviously, Zapata either lied to the public defender or he lied at trial. The determination of which version to believe was one for the jury. Zapata testified that he had lied to the public defender, the person representing defendant, because he feared the defendant. The articulated fear of reprisal from a defendant in a homicide case which caused a witness to repudiate his story prior to trial in a conversation with defendant's own representatives would by no means require a

jury to reject that witness' in-court testimony in which he denounces his prior repudiation. See *People v. Walker* (1992), 230 Ill. App. 3d 377, 393.

In addition to the testimony of Zapata, the State also offered the eyewitness testimony of Najera, who testified that defendant was one of only two people standing from where the gunshots came. Najera also testified that the person standing with defendant, Rosales, was swinging a bat and that he had never seen a gun in Rosales' hand. As such, the inference was clear and overwhelming that defendant fired the shot which killed the victim.

■ Defendant asserts that Najera's testimony that he did not see Zapata on the night of the shooting calls into question Zapata's testimony that he was close to defendant at the time of the shooting. Contrary to defendant's contentions, Najera's testimony is more corroborative than impeaching. Defendant's asserted defense throughout the trial was that he was not there when the shooting occurred. Najera's testimony that he saw defendant standing right next to the car in which the victim was riding and that he saw and heard gunshots come from where he was standing not only places defendant at the scene, but in the immediate vicinity of the gunshots. This testimony corroborates Zapata'a account. Najera did not testify that Zapata was absent, but that he did not recall Zapata as present among the 8 or 10 people there at the time, some of whose faces he could not see.

■ Defendant's assertion that his girl friend's corroboration of his alibi that he was with her at the time of the shooting was unimpeached is also unavailing. Like the credibility of the State's witnesses, the plausibility of defendant's alibi was for the trier of fact to determine (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317), and it is within the province of the jury to reject that alibi, even if uncontradicted (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 467 N.E.2d 1037). Here, the jury could have rejected defendant's alibi in light of the identification made by the State's witnesses. (*People v. Seider* (1981), 98 Ill. App. 3d 175, 423 N.E.2d 1217.) Moreover, Sida's testimony corroborating defendant's alibi was impeached by virtue of her close personal relationship with defendant (*People v. Garza* (1981), 92 Ill. App. 3d 723, 415 N.E.2d 1328), and Keane's rebuttal testimony regarding Sida's earlier inconsistent statement that she had not seen defendant after 6 or 7 p.m. on the night of the shooting. Although not contained in his written report, the jury was nevertheless free to accept Keane's in-court testimony that Sida in fact made that statement to him. (*People v. Fairbanks*, 141 Ill. App. 3d 909, 491 N.E.2d 74.) Accordingly, there is abundant evidence to support the ju-

ry's verdict that the defendant was guilty of homicide beyond a reasonable doubt.

Defendant next contends that reversal is mandated because the erroneous admission of evidence and prejudicial comments made by the State during its closing argument deprived him of a fair trial. With regard to the evidentiary arguments, defendant specifically claims that he was prejudiced by the prosecution's introduction of evidence of a previous fight between the victim and one of defendant's fellow gang members, the trial court's decision to allow photographs of the severed codefendants to go back with the jury during deliberations, and the testimony of the investigating officer which implied that the severed codefendants had implicated defendant.

●4 First, defendant claims that the introduction of the Oak Street Beach altercation between severed codefendant Rosales and Marrone constituted reversible error. The State argues that this testimony was properly admitted as relevant to show the motive for the crime. We disagree. In *People v. Smith* (1990), 141 Ill. 2d 40, 56, 565 N.E.2d 900, the Illinois Supreme Court stated "when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts." There, the court determined that it was error to admit evidence of minimal personal contact between the defendant and an imprisoned gang leader and evidence of an altercation between the gang leader and the victim, an assistant prison warden. The court determined that the evidence presented was insufficient to establish defendant's membership in the gang leader's gang and consequently such evidence could not show defendant's motive for the murder.

Although the admission of this single incident does not rise to the level of the error in *Smith* because, unlike *Smith*, defendant's gang affiliation here has been affirmatively established through other evidence, we determine that its admission was nonetheless error. See *People v. Moreno* (1992), 238 Ill. App. 3d 626, 606 N.E.2d 514, where this court held that admission of the same Oak Street Beach altercation was error, albeit harmless, in codefendant's trial because there was no evidence in the record which showed that Moreno was aware of the incident. Likewise, there was no evidence offered at trial here that defendant was present at or had any knowledge of the altercation between Rosales and Marrone, making the probative value of such evidence tenuous at best.

Although the admission of the Oak Street Beach altercation constituted error, here as in *Moreno*, it was harmless. There was substantial evidence offered by the State in this case. The State presented

the testimony of two eyewitnesses who identified defendant as the person who shot the victim. Additionally, the proffered defense that defendant was at home was directly contradicted by both of these witnesses, and the alibi testimony provided by Sida was impeached by Detective Keane's testimony.

Moreover, while defendant cites this error as one of the many instances where the severed codefendants have been injected in an attempt to prejudice him by guilt through association, the admission of this incident does not assert or even imply any facts that are not already present in the testimony of the witnesses. Defendant admitted that he was a member of the Spanish Cobras at the time of the incident. There was testimony from Garza, Zapata, and Najera confirming that Rosales and the other individuals involved in the shooting were also Spanish Cobras. There was considerable testimony that the Spanish Cobras and the C-Notes were rival gangs that was corroborated by the photograph of the El Domino bar with the markings identifying it as Spanish Cobra territory and asserting that the Cobras were C-Note killers. In light of all of these factors, any error in the admission of the Oak Street Beach altercation was harmless. See *Moreno*, 238 Ill. App. 3d at 637 (determining that admission of Oak Street Beach incident and submission of photographs of Cosme, Rosales and Leal was harmless error in trial of severed codefendant Moreno).

We also agree with the *Moreno* court that the submission of the photographs of defendant's severed codefendants, Rosales, Leal, Velasquez and Moreno, to the jury room was error, albeit harmless. It is within the trial court's discretion to determine which evidentiary items should be taken back into the jury room (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183), and the trial court can allow items to go to the jury if relevant to a material issue. *People v. Arnold* (1985), 139 Ill. App. 3d 429, 487 N.E.2d 997.

■ The State argues that these photographs were relevant to support Zapata's and Najera's testimony that they were afraid to testify because of the other gang members and that they helped the jury understand the testimony of the witnesses. This argument is unavailing. Zapata did not testify that he was afraid of any one other than defendant; Najera did not testify that he was afraid to testify at trial. Furthermore, there is no indication that allowing these photographs to go back with the jury served any useful purpose in understanding the testimony of any witness. Although the State's witnesses did identify these individuals as present at the shooting, their identification was not a contested issue. (See *Moreno*, 238 Ill. App. 3d at 637.) As

the photographs are not relevant to any material issue, we must determine that the trial court erred in allowing them to go back with the jury during deliberations. However, for the same reasons as discussed earlier with respect to the admission of the Oak Street Beach incident, we find that any error was harmless. These include the fact that two eyewitnesses directly and circumstantially established that defendant was the shooter and the ample testimony which established the complicity of the defendant and the codefendants in the events that led to the shooting as well as the gang affiliation of defendant and his codefendants as Spanish Cobras. This rendered any inference derived from the admission of the photographs harmless in face of the overwhelming evidence of defendant's guilt.

Defendant next argues that the trial court erred by allowing Detective Keane to testify that he obtained an arrest warrant for defendant after talking to the severed codefendants, thus improperly implying that they had implicated defendant. At the outset, we note that this contention, even if correct, is waived. Although defendant did object the first time the prosecution attempted to elicit this information, he failed to object after the prosecution rephrased the question and elicited the allegedly improper response. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ However, if there was no waiver, we would conclude that the trial court did not err in allowing the jury to hear this testimony. It is well established that testimony of a police officer as to his investigatory procedures which reveals a conversation with a codefendant, but does not reveal its contents, is admissible even if a logical inference may be drawn that the officer took subsequent steps as a result of the substance of that conversation. (*People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146; *People v. Miller* (1992), 225 Ill. App. 3d 92, 589 N.E.2d 617.) In fact, the Illinois Supreme Court has recently redefined this rule by allowing an officer to testify pertaining to the substance of a conversation with a nontestifying witness, so long as that substance did not go "to the very essence of the dispute." (*People v. Jones* (1992), 153 Ill. 2d 155, 160, 606 N.E.2d 1145.) Here, Keane's testimony only referred to the conversation between the officers and the severed codefendants, but did not purport to explicitly disclose any of its contents. Thus no error occurred in admitting this testimony. *People v. Simms* (1991), 143 Ill. 2d 154, 572 N.E.2d 947 (no error occurred by admission of testimony which could have implied that nontestifying witness had implicated defendant).

The last issue in defendant's fair trial claim concerns 10 separate comments made in the prosecution's closing argument. Normally, re-

marks made during closing argument are not grounds for reversal and prosecutors are given wide latitude during their closing arguments. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Tyson* (1985), 137 Ill. App. 3d 912, 485 N.E.2d 523.) The propriety of the prosecution's remarks are left to the discretion of the trial court and shall be followed absent an abuse of discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324; *People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.) The test for determining whether the remarks constitute reversible error is "whether the remarks, considered in light of all the evidence, were a material factor in the conviction, or whether the jury might have reached a different result had the comments not been made." *People v. McCall* (1989), 190 Ill. App. 3d 483, 493, 546 N.E.2d 62.

In its closing arguments, the prosecution made the following three statements, to which defense counsel's objections were overruled:

(1) The prosecutor stated that two of the State's witnesses testified that they saw defendant pumping bullets into the car. Defendant claims that this remark misstates the evidence as only one witness, Zapata, testified that he saw defendant fire into the car.

(2) The prosecutor commented that defendant would not want to be with his girl friend on a Friday night, but would rather be on the streets with his friends. Defendant contends that this comment is not based on evidence in the record because there was no testimony that defendant was friends with the other Cobras.

(3) Regarding Juan Zapata, the prosecutor remarked that he was afraid not only of the defendant, but "the other defendants, the other Cobras that are out there." Defendant contends that as Zapata never stated that he was afraid of anyone but defendant, this remark was error.

■ Clearly, the trial court was correct in overruling objections to the first two statements because they unquestionably constituted fair comments on the evidence presented or reasonable inferences therefrom. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840 (prosecution may base its closing argument on evidence presented or reasonable inference therefrom).) First, to count Najera as a witness who saw defendant fire into the car is a fair comment on the evidence where Najera stated that he saw and heard shots come from where defendant was standing and the only other person in that area, Rosales, was holding a baseball bat at that time and could not have been holding a gun.

With respect to the second statement, Zapata testified that all of these individuals were "friends with each other," thus providing an

unequivocal basis for the prosecutor's statement. Moreover, defendant admitted membership in the Spanish Cobras and other testimony established that his codefendants were also Cobras. See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864 (defendant not prejudiced by closing argument remark that he was a gang member when there was sufficient evidence in record to support that statement).

Third, the propriety of the prosecution's comment, that Zapata was afraid of testifying because of "the other Cobras that are out there," is more tenuous, but still arguably permissible. Based upon the strong evidence of defendant's gang affiliation, the complicity of various other gang members in the events leading to the shooting, and the evidence that the crime was gang motivated, it is reasonable to infer that a witness' express fear of testifying against defendant in this context would extend to other gang members who were involved in the same incident. However, even if it was error to extrapolate fear of other Cobras in general from the testimony which established his fear of defendant explicitly, it was harmless because the prosecutor's single statement that Zapata feared the "other Cobras" as well as defendant had marginal impact over Zapata's own repeated assertions that he feared defendant. (*People v. Walker* (1992), 230 Ill. App. 3d 377, 594 N.E.2d 1252.) In both cases, the message conveyed was the same, that Zapata lied to the public defender because he was afraid. Consequently, this extrapolation could not have had a serious impact upon the jury's resolution.

Defendant also assigns as error seven additional remarks made by the prosecution in its closing argument to which its objections were sustained. On appeal, the State contends that its remarks were proper and did not warrant the ruling which sustained the defendant's objection to them. We agree with the State as to two of these statements and in part as to the third one.

(1) The prosecutor remarked that "[C]ounsel told you in his opening statement two issues. One identification and one murder, whether murder was even committed. I don't know about you, but after they decided to put evidence on, I was waiting to hear the evidence there was no murder committed." Ordinarily, this type of statement would constitute error because it suggests that defendant was required to put forth evidence that no murder had occurred. (*Tyson*, 137 Ill. App. 3d at 921-22.) In this instance, however, it could be perceived that the comment of the prosecution was invited by statements made during the defendant's opening statements at which time defense counsel told the jury that one of the issues at trial would be "whether or not a murder under the law was com-

mitted." It is within the latitude of the discretion allowed a prosecutor in closing argument to comment on defense counsel's failure to produce evidence which he represented that he would produce in opening statements. *People v. Huddleston* (1988), 176 Ill. App. 3d 18, 30, 530 N.E.2d 1015 ("[a]n attorney may also comment upon opposing counsel's failure to produce evidence promised in opening statement so long as the comments do not reflect upon defendant's failure to testify").

(2) The prosecutor commented in rebuttal that "[Defense] [c]ounsel likes you to believe it's only two on two like it's some kind of game, you bring in two guys, we bring in two guys." Although a remark which suggests that a defense counsel is misleading the jury is error (*People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078), the prosecutor's comment in this instance was invited by defense counsel's statement in closing argument that, "[w]hat it comes down to is basically four witnesses—the two from the State who said they were there, *** and the two from the defense who say that Mr. Cosme was not there." Defense counsel initially raised the number of witnesses testifying for each side, and as such, the prosecutor's response, which, in effect, responded that the number of witnesses was not the only relevant consideration, cannot be considered error. *People v. Reeves* (1992), 228 Ill. App. 3d 788, 593 N.E.2d 683.

(3) The prosecutor stated, "Decide if its his girl friend and him that are telling the truth or these people who really didn't want to come to court and risk their lives and their safety." Defense contends that this argument is based on speculation or surmise. We disagree in so far as pertaining to Zapata. Zapata repeatedly testified that he was afraid of defendant, and as such, the prosecution's comments that he was risking his safety were an accurate perception of Zapata's articulated state of mind. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38.) This comment constituted error, however, to the extent that it implied that other witnesses were in fear of their safety when none of those witnesses had in fact so testified. (*People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078.) However, any limited error which resulted from this comment was harmless (*People v. Johnson* (1991), 220 Ill. App. 3d 550, 581 N.E.2d 118) and was cured when the trial court sustained defense counsel's objection and subsequently instructed the jury that the arguments of counsel did not constitute evidence. See *Walker*, 230 Ill. App. 3d at 400; *People v. Graca* (1991), 220 Ill. App. 3d 214, 580 N.E.2d 1328.

With respect to the remaining four statements to which the trial court sustained defense counsel's objection, we agree with defendant that these statements were improper but nevertheless conclude that they were harmless. These statements are as follows:

(1) The prosecution twice described defendant's alibi as a "charade." This statement improperly denotes that defendant fabricated his alibi. See *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.

(2) The prosecutor remarked that defendant would not reveal the last name of his uncle because he did not want the State to send someone out to find him. This comment misstates the evidence presented because defendant did reveal his uncle's last name and therefore the trial judge was correct in sustaining defense counsel's objection. See *People v. McCall*, 190 Ill. App. 3d at 493.

(3) With respect to Sida's testimony, the prosecutor commented that "she took an oath, I can't believe she did this but she did it." Although a prosecutor may fairly comment on inconsistencies present in the testimony of a witness, he may not interject his personal belief as to the veracity of a witness' testimony. See *People v. Bell* (1987), 152 Ill. App. 3d 1007, 505 N.E.2d 365.

(4) With respect to Sida's testimony, the prosecutor stated that "Of course you know she can't say [she] doesn't know his friends, can't say she knows Danny and Felipe and Manuel and the rest of the guys because they're all the guys involved in the murder and she knows that." Sida testified that she did not know defendant's friends and that she did not know he was in a gang. The prosecution's remarks improperly imputed knowledge of the murder and defendant's friends to Sida and as such constituted error. See *People v. Kelly* (1985), 134 Ill. App. 3d 732, 480 N.E.2d 1343.

While there is little question that the latter four remarks were improper, their impact is insufficient to require a new trial. Moreover, we note that even if each of the latter seven remarks was improper, they would not rise to the level of reversible error either individually or cumulatively. Foremost, defense counsel's objections to all of the objectionable statements were sustained by the trial court and the jury was subsequently instructed that the arguments of counsel were not evidence and any argument not based on evidence should be disregarded. (See *People v. Scott* (1990), 194 Ill. App. 3d 634, 645, 551 N.E.2d 288 ("[a]ny error was harmless, particularly in light of the court's subsequent instruction to the jury that argument was not evidence and any argument not based on the evidence should be disregarded"); see also *People v. Garcia* (1992), 231 Ill.

App. 3d 460, 596 N.E.2d 1308.) Secondly, considering the strength of the evidence against the defendant as previously analyzed and discussed, we do not have sufficient grounds to find that the jury's verdict would have been impacted by any of these statements either individually or cumulatively even if the objections to them had not been sustained by the trial judge.

We do not condone the conduct of the prosecutor in his use of invectives when referring to defendant's alibi as a charade, or in injecting his personal opinion as to the credibility of a witness and his imputation of knowledge to a defense witness which has not been established by the evidence. However, prosecutorial misconduct cannot ordinarily be a basis for reversal if its impact is not outcome determinative. In such instances, regulation of prosecutorial conduct must come through self and intra-office insistence upon uncompromised professionalism.

Defendant's final contention on appeal is that his 50-year sentence for first degree murder was excessive in view of the fact that he was only 18 years old and had no adult criminal convictions. Initially, the State contends that defendant has waived this issue because he did not object to the sentence at the hearing. We disagree. Although defendant did not object to the sentence on the grounds that it was excessive after that sentence was handed down, he did raise the same relevant considerations at the sentencing hearing that he now raises on appeal. As such, we cannot say that defendant's failure to reargue these points immediately after the sentence was imposed resulted in a waiver of this argument.

Turning to the merits, defendant argues that the trial court's sentence discounts the possibility of reform and will keep the defendant from having "an opportunity to embark upon a potentially productive life in society until he is at least forty-three years old." The State responds that the trial court did not abuse its discretion in sentencing defendant in light of defendant's numerous juvenile offenses and the circumstances surrounding the crime.

The sentencing of a defendant is within the sound discretion of the trial court (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606), and a reviewing court is reluctant to disturb the sentence imposed by a trial court when it is within the range set by the legislature, as is the case here. (*People v. Gaurige* (1988), 168 Ill. App. 3d 855, 522 N.E.2d 1306.) The trial court's determination of the appropriate sentence is based on a number of factors, including the circumstances surrounding the crime, the seriousness of the crime itself, defendant's general moral character and credibility, and

defendant's age and criminal history. (*People v. Luna* (1992), 234 Ill. App. 3d 544, 600 N.E.2d 1212; *People v. Aguinaga* (1992), 231 Ill. App. 3d 153, 598 N.E.2d 984.) The weight to be given each of these factors depends on the particular circumstances of each case. *People v. D'Arezzo* (1992), 229 Ill. App. 3d 428, 602 N.E.2d 462.

■ Considering these factors, we cannot say that the trial court abused its discretion in sentencing the defendant to 50 years in prison. Although defendant was only 18 years old at the time of the crime and this was his first criminal offense as an adult, he had already been convicted of four offenses as a juvenile including two residential burglaries, a battery, and a criminal sexual assault. (See *People v. Morando* (1988), 169 Ill. App. 3d 716, 523 N.E.2d 1061 (trial court did not abuse its discretion in sentencing 19-year-old defendant to a term of natural life imprisonment for the murder of a 57-year-old woman when defendant had two prior juvenile offenses, one for burglary and one for automobile theft, one adult burglary conviction and had not been out of trouble with the law since he was 15 years old).) Moreover, the factual circumstances of the crime support the imposition of the sentence because, as the trial court noted, this murder was more of an "assassination" and demonstrated defendant's disregard for human life. Here, defendant heard that there were members of a rival gang in the neighborhood, ran to get his gun, and then fired twice into a car full of people without any provocation other than the fact that those people were in a rival gang.

Despite defendant's contentions to the contrary, the trial court expressly considered defendant's potential for reform, as well as other mitigating factors, but found it was outweighed by the aggravating factors present including the recognized interest in protecting the public and providing a deterrent. This weighing of interests is not an abuse of discretion (*People v. Clark* (1987), 160 Ill. App. 3d 877, 513 N.E.2d 937); deterrence and the protection of the public are relevant considerations in sentencing. (*People v. Harris* (1992), 231 Ill. App. 3d 876, 596 N.E.2d 1363.) Contrary to defendant's objection, the rehabilitation of the offender is only one of the relevant factors to consider (*People v. Aguinaga*, 231 Ill. App. 3d at 175-76) and it must be balanced against the objectives of protecting society. (*People v. Smith* (1992), 231 Ill. App. 3d 584, 596 N.E.2d 669.) In view of the defendant's criminal history and the manner in which the crime was committed, we cannot say that the balance struck by the trial court in sentencing the defendant to 50 years constituted an abuse of discretion.

For the foregoing reasons, the judgment of the trial court is affirmed.

Judgment affirmed.

MURRAY and McNULTY, JJ., concur.